the respondent clicked on the link provided to them, it directed them to the Qualtrics.com site where they were randomly assigned to either the control condition or to the test condition and then presented with the corresponding survey.

50. The survey instruments were identical across conditions in every respect except of course for the stimuli participants were exposed to.

51. I employed an over-sampling technique — stopping data collection above the desired 1100 respondent mark so that when unusable respondents[30] were removed from the qualified dataset, 1100 completed and usable responses were included in the analysis dataset—550 in the test condition and 550 in the control.

52. The survey began with the screener questions. All respondents were presented with all the screener questions. That is, they were not removed from the survey if they disqualified until the end of the screener section. Further, an active response to every screener question was required by the survey software ensuring no overlooked, omitted, or unanswered questions.[31]

---

[30] 1127 completed responses were collected. 27 responses (2.4%) were eliminated because at the end of the survey, they indicated they possessed some knowledge of a legal dispute between GM and Urban Gorilla. Statistical analysis showed that this procedure had no material effect upon the net confusion rate (50%) or upon significance tests.

[31] This is a categorical advantage of online surveys eliminating the possibility of missing data and the potential bias that may be introduced through the various methods used to deal with missing responses.

53. At the completion of the screener questions, the computer required respondents who did not fit the criteria to exit the survey and prevented them from continuing to answer any subsequent questions. If they did not qualify for any of the reasons catalogued in the screener criteria above, the respondents exited the survey. If the respondent did qualify, he/she was then presented with the stimuli (either test or control) and subsequently the main questionnaire.

54. Data collection began on May 25, 2007 and concluded June 4, 2007.

Test and Control Stimuli

55. After qualifying for participation in the survey, respondents were presented with the following directions:

> **I'm now going to show you a product that you may or may not have seen before. Please examine the product in the same way you would if you came across it on the street and noticed it during your day-to-day activities. Please take as much time or as little time with the product as you wish. When you are ready, please advance to the next section.**

Once the participant had read these instructions, they advanced to the presentation of the stimuli (either test or control depending on their random assignment). These instructions were patterned after those suggested in the literature[32] to create a post-sale context. In fact, the design of the survey attempted

---

[32] See Henry D. Ostberg, Response to the Article Entitled, "A 'Reading' Test or a 'Memory' Test: Which Survey Methodology is Correct?", 95 TMR 1446 (2005).

to replicate as far as it is possible a post-sale experience with the product.[33]

56. High quality images of the front, profile, and rear of the Urban Gorilla vehicle were presented in the test condition. Test stimuli images presented to test condition respondents are available in Exhibit 4.

57. A natural product control was employed for presentation in the control condition.[34] Control stimuli images presented to control condition respondents are available in Exhibit 5.

58. This product is an obscure but actual body kit used on an SUV chassis. It appears to be a 4-wheel-drive vehicle with off-road capabilities well suited to work as a control in this context. Like the GM Hummer, the control vehicle is large and designed with elements required to facilitate off-road use. These functional elements--such as high ground clearance, open wheel wells, large rear-view mirrors, large tires with an aggressive tread design, etc.--are not an issue in this test of confusion and are thus present in both conditions to control for their impact on consumers evaluations of the vehicles.

---

[33] See Mike Rappeport, Response to Survey Methodology Articles, 96 TMR 769 (2006).
[34] For a discussion of natural and derived controls, see Jacob Jacoby, Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys, 91 TMR 890, 918 (2002).

59. However, the non-functional and design-oriented external elements of the GM Hummer H1 are not part of this control vehicle. Where the Hummer H1 is "boxy" and angular, the control is sculpted and rounded. The door shapes, straight lines and styling, hood latches, square door handles, exposed door hinges, rear double doors, perpendicular mount of the windshield, split-windshield, descending wipers, side panel accents, etc., are all different in this control from the actual GM Hummer H1 and also from the Urban Gorilla product.[35] Thus comparing the results of the test and control conditions "nets" out the effect of being a rugged, off-road capable four-wheel-drive on consumer's product evaluations. In turn, the "net" confusion rate (derived by subtracting the confusion rate observed in the test condition from those of the control) gives some assessment of the impact the combination of these variables has on consumers' evaluations.

60. The backgrounds of all images were made to be identical and both vehicles are colored a neutral white to eliminate any potential impact of product color on consumers' evaluations.

61. Following presentation of the images, this question was presented to consumers:

---

[35] A few of these elements were part of the control vehicle's original photos and thus were subsequently removed from the stimuli photos by an imaging expert to prepare the images to serve as an effective control in this study.

> Is your computer displaying the product images? That
> is, can you see them?

62. This question was an additional verification that they were able to see the stimuli. As with all the questions, the computer required a response before continuing with the survey, thus this and all other main questionnaire questions had no missing data.

Main Questionnaire

63. It is well-known that at times respondents provide answers even when they do not know the answer. Thus it is common and accepted practice to explicitly instruct respondents not to guess. Such instruction decreases, though it may not eliminate the tendency to guess. Accordingly, respondents were instructed:

> Now for a few questions about the product you just
> saw. For each of the questions, if you do not know or
> do not have an opinion, please do not guess. Just
> answer that you "don't know" or that you "do not have
> an opinion" and continue on to the next question.

At this point, the main study questions were administered.

64. Three batteries of questions were used to measure, if any, a likelihood of confusion as to source, sponsorship, or affiliation. The first question block related to source:

> What company do you believe puts out this product?[36]

---

[36] This first battery of questions were designed to address the issue of likelihood of confusion as to source or origin and were patterned after similar accepted questions. See Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366 (7th Cir. 1976), cert. denied, 429 U.S. 830, 50 L. Ed. 2d 94, 97 S.

Participants were given two response options. Either they could type in their response or they could select a button that indicated "**I don't know or I don't have any opinion.**"

65. If respondents indicated a belief as to the source of the product, they were asked two follow-up questions investigating the basis for that belief:

> **Why do you say that?**

And

> **What else, if anything, makes you say that?**

66. Finally, as a check to ensure understanding of the respondent's previous answer, a final follow-up question was administered. First, the initial question was repeated and the participant's previous response was presented, then the follow-up question:

> **In response to the earlier question, "What company do you believe puts out this product?" you said: [Respondent's Answer Presented]**
>
> **What other products does that company put out?**

67. This process of questioning provides respondents opportunity to fully express and explain their thoughts and provides extended information to facilitate an accurate assessment during data analysis of the consumer's state of mind.

---

Ct. 91 (1976); and 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, §32:174 (4th ed. 2007).

68. In fact, a leading commentator on trademark law has noted:

> Often, an examination of the respondents' verbatim responses to the "why" question are the most illuminating and probative part of a survey, for they provide a window into consumer thought processes in a way that mere statistical data cannot.[37]

69. If respondents indicated that they did not know or did not have any opinion to the initial source question, the subsequent source questions were skipped and the second battery of questions was administered.

70. The next battery of questions sought to measure the likelihood of confusion as to sponsorship or authorization.[38]

71. First, participants were told:

> **Next, please answer a few more questions. This is a question with multiple choice answers. We are referring to the product you looked at previously.**

72. Then respondents were shown the first question in the authorization battery:

> **Do you believe that the company that puts out this product:**
> - **o ...did get authorization or sponsorship, that is permission, to make it.**
> - **o ...did NOT get authorization or sponsorship, that is permission to make it.**[39]

---

[37] 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, §32:175 (4th ed. 2007).

[38] Again, these questions were patterned after similar accepted questions. See National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc, 532 F.Supp. 651, 659, 215 U.S.P.Q. 175, 181-83 (W.D. Wash. 1982); and 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, §32:175 (4th ed. 2007).

[39] As an added precaution against order effects and possible order bias, these first two affirmative and negative response options were randomly presented to participants so that approximately half of the respondents were presented

o **I don't know or I don't have any opinion.**

73. If the respondent indicated that she/he did not know or did not have any opinion, she/he was skipped to the final battery of questions.

74. If respondent indicated she/he believed that the company that puts out this product did get permission, she/he was asked three follow-up questions investigating the basis for that belief:

> **What company, firm, or organization do you believe gave permission?**

This question is an open-ended question and participants were required to type in their response. Then, as in the source battery, respondents were asked two follow-up why questions investigating the basis for that belief:

> **Why do you say that?**

And

> **What else, if anything, makes you say that?**

75. And again, as a check to ensure understanding of the respondent's previous answer, a final follow-up question was administered. First, the previous question was repeated and the participant's previous response was presented, then the follow-up question:

---

with the first response option being "..<u>did</u> get authorization or sponsorship..." and the other half first presented with the response option "..<u>did NOT</u> get authorization or sponsorship...".

> Earlier in response to the question, "What company, firm, or organization do you believe gave permission?" you said: [Respondent's Answer Presented]
>
> What other products are made by the company, firm, or organization that you believe gave authorization or permission?

76. Finally, the last business affiliation battery of questions was administered.

77. Respondents were instructed:

> Next, please answer another question with multiple choice answers. Again we are referring to the product you looked at previously.

78. Then respondents were shown the first question in the business affiliation battery:[40]

> Do you believe that the company that puts out this product:
> o ...does have a business affiliation with another company, firm, or organization.
> o ...does NOT have a business affiliation with another company, firm, or organization.[41]
> o I don't know or I don't have any opinion.

79. If the respondent indicated that they did not know or did not have any opinion, she/he was skipped to the final questions.

---

[40] These questions too were patterned after similar accepted questions. See National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc, 532 F.Supp. 651, 659, 215 U.S.P.Q. 175, 181-83 (W.D. Wash. 1982); and 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, §32:175 (4th ed. 2007).

[41] Again, as a precaution against order effects and possible order bias, these first two affirmative and negative response options were randomly presented to participants so that approximately half of the respondents were presented with the first response option being "_does_ have a business affiliation..." and the other half first presented with the response option "_does NOT_ have a business affiliation...".

80. If respondents indicated they believed that the company that puts out this product did have a business affiliation, they were asked three follow-up questions:

> **With what other company, firm, or organization do you believe they have a business affiliation?**

This question is an open-ended question and participants were required to type in their response. Then, as in the preceding source and sponsorship batteries, respondents were asked two follow-up why questions investigating the basis for that belief:

> **Why do you say that?**

And

> **What else, if anything, makes you say that?**

81. And finally, as a check to ensure understanding of the respondent's previous answer, a final follow-up question was administered. First, the previous question was repeated and the participant's previous response was presented, then the follow-up question:

> **Earlier in response to the question, "With what other company, firm, or organization do you believe they have a business affiliation?" you said: [Respondent's Answer Presented]**
>
> **What other products are made by the company, firm, or organization you believe is affiliated with the one that puts out this product?**

82. After the final business affiliation battery, respondents answered a demographic question relating to their state of residence.

83. Then respondents answered questions that could not be presented prior to exposure to the test or control stimuli because doing so would have sensitized consumers' responses. First a question about their previous participation in the building of a "kit" car:

> **As you may be aware, some people by way of hobby or profession assemble automobiles themselves by purchasing the required parts in a "kit" and then assembling them on their own with their own labor. These vehicles are often called "kit" cars. Have you, yourself, ever assembled or participated in the building of a "kit" car?**

84. Then respondents were asked about their future plans, if any, in this regard:

> **During the next three years, do you, yourself, expect to assemble or participate in the building of a "kit" car?**

85. Then consumers were asked:

> **Do you now own a Hummer or have you ever owned a Hummer?**

86. Seeing the brand name Hummer *prior* to seeing the product images would have cued responses toward Hummer in an unnatural way. Thus these questions were presented after so that they could not affect consumers' responses to the main questionnaire. Respondents could not return to a previous section after they had answered those questions.

87. Finally, respondents were asked if by profession, if they or anyone in their household was a lawyer, and if they had

heard anything about a legal dispute between General Motors and Urban Gorilla.

88. Again, this is a question that could not have been asked prior to exposure to the test or control stimuli without possibly sensitizing responses in an unnatural way.

89. A copy of the main questionnaire is appended in Exhibit 6.

90. In all, 1127 respondents completed all aspects of the survey and because of the validation required by the software administration of the survey, all questions were answered presenting a final dataset with no missing responses. Twenty-seven responses (2.4%) were eliminated because at the end of the survey, they indicated they possessed some knowledge of a legal dispute between GM and Urban Gorilla. Statistical analysis showed that eliminating these responses did not materially change the net confusion rate.[42]

91. Therefore these responses were removed from subsequent analysis leaving a data set of 1100 responses with 550 completed responses in each condition.

SURVEY RESULTS

Demographic Analysis

92. Because of the quota sampling and the strict screener criteria employed in the study, the demographic profile of the

---

[42] Overall net confusion was 50.0% before these responses were eliminated and 50.4% after they were eliminated.

respondents in this survey is representative of the expected demographic profile of the relevant population.

93. In harmony with the demographic income profile of the full-size SUV market, 416 respondents (38% of survey participants) had combined pre-tax household income in the range of less than $20,000 per year to $59,999 (market profile proportion, 38%)[43]. 550 respondents (50% of survey participants) had household incomes ranging from $60,000 to $149,999 (market profile proportion, 50%). 134 respondents (12% of survey participants) had household incomes greater than $150,000 (market profile proportion, 12%). Thus on combined pre-tax household income, the survey participants exactly represent the market profile. These proportions remain exact in each survey condition--test and control. Each condition has 208 respondents (38%) with income between $0 and $59,999; 275 respondents (50%) with income between $60,000-$149,999; and 67 respondents (12%) with income greater than $150,000.

94. Again in harmony with the demographic gender profile of the full-size SUV market, 560 respondents (50.9% of survey participants) were male (market profile proportion 50.4%)[44] while

---

[43] For market profile proportions, see Mediamark Research Inc., Decision Makers for Full Size SUVs, www.mriplus.com accessed May 21, 2007.
[44] See Mediamark Research Inc., Decision Makers for Full Size SUVs, www.mriplus.com accessed May 21, 2007 (The best data available on gender (indicating a largely balanced distribution) is only available in conjunction with the 25-54 age group. That is, since this age group represents 74 percent of the market and I have good data indicating that within this age

540 respondents (49.1% of survey participants) were female (market profile proportion 49.6%). These proportions remain constant across the two survey conditions providing a balanced gender response to both stimuli.

95. With regard to age, these respondents approximate the profile of the market. 865 respondents (79% of survey participants) fall within the main age category of 25-54 (market profile proportion 74%)[45].

96. Finally, with regard to educational attainment, again these survey respondents approximate the expected market profile. 879 respondents (80% of survey participants) attended college or graduated from college (market profile proportion 80.7%)[46].

97. Due in part to the robust sample size employed in this study (1100 respondents), the geographic distribution of participants in the study almost mirrors the national distribution of United States population.[47] Respondents from all but one state are represented in the sample (inclusive of the

---

group gender is almost balanced, I use these data as a proxy for the market gender profile as a whole).
[45] See Mediamark Research Inc., Decision Makers for Full Size SUVs, www.mriplus.com accessed May 21, 2007.
[46] see Darrel Edwards, Large SUV Buyer Demographics, Strategic Vision, www.strategicvision.com accessed May 22, 2007.
[47] Looking at these data through the comparative lens of the regional distributions of population reported by the US Census: 19.5 percent of these respondents live in the Northeast (US Census: 18.3 percent of US lives in the Northeast); 35.0 percent of the sample comes from the South (US Census: 36.4 percent of the US lives in the South); 22.3 percent of the sample lives in the Midwest (US Census: 22.1 percent of US lives in the Midwest); 23.2 percent of the sample lives in the West (US Census: 23.2 percent of the US lives in the West).

District of Columbia).[48] The use of an online survey methodology enabled the collection of such a broad, geographically diverse and representative sample of respondents.

Results

98. In the test condition 393 of the 550 respondents (71.5 percent) indicated confusion as to source, sponsorship, or affiliation. These respondents overtly referenced Hummer and explained that answer most often because it looks like a Hummer. That is, because of the combination of design elements in the Urban Gorilla, 71.5% of respondents in the test condition came away with the erroneous, gestalt impression that the Urban Gorilla is a GM Hummer.

99. For example, many respondents, after indicating Hummer or GM as the source of the vehicle, indicated something similar to this prototypical response, "It looks like a Hummer and is built like one. Hummers are not like cars and trucks so they stand out from all the others." Others, with little indication of uncertainty, simply noted as a basis for their belief that Hummer made the product, "Because it's a Hummer," or "Because it is a Hummer vehicle." Table 1 below summarizes the responses of test condition participants across all three question batteries.

---

[48] Only Vermont is not included.

- 34 -

## Table 1
Test Condition
(n=550)

Aggregated Responses Across Three Question Batteries
(Source, Authorization, and Affiliation)

| Response Categories | Response Distribution | |
|---|---|---|
| | Number | Percent |
| 1. GM/Hummer | 393 | 71.5% |
| 2. Jeep | 31 | 5.6% |
| 3. Toyota | 1 | 0.2% |
| 4. GM/GMC/Chevy without reference to Hummer | 24 | 4.4% |
| 5. Ford | 8 | 1.5% |
| 6. Honda | 1 | 0.2% |
| 7. Other Car Company (Nissan, Isuzu, etc.) | 2 | 0.4% |
| 8. Military/US Government | 14 | 2.5% |
| 9. Other | 5 | 0.9% |
| 0. Don't Know | 71 | 12.9% |
| | 550 | 100% |

100. In the control condition, 116 of the 550 respondents (21.1) indicated GM Hummer as either the source of the product, the sponsor of the product, or affiliated with the company that puts out the product. These participants explained their responses at times in terms ephemeral, intangible elements such as, "It has that masculine rugged look." Another respondent noted, "The overall look is one of intimidation, which to me is a Hummer Trademark. It has the ruggedness and style as well." Others referenced, "The big wheels, I love those," and "It's ugly, it's huge, and it looks like it has a lot of off road capabilities." These functional elements were purposefully

included in the control to make it a strong control for isolating the exterior body style and design elements included in the Urban Gorilla product that are similar to the GM Hummer vehicle. Table 2 below summarizes the responses of control condition participants across all three question batteries.

**Table 2**
Control Condition
(n=550)

Aggregated Responses Across Three Question Batteries
(Source, Authorization, and Affiliation)

| Response Categories | Response Distribution | |
| --- | --- | --- |
| | Number | Percent |
| 1. GM/Hummer | 116 | 21.1% |
| 2. Jeep | 86 | 15.6% |
| 3. Toyota | 80 | 14.5% |
| 4. GM/GMC/Chevy without reference to Hummer | 15 | 2.7% |
| 5. Ford | 13 | 2.4% |
| 6. Honda | 22 | 4.0% |
| 7. Other Car Company (Nissan, Isuzu, etc.) | 32 | 5.8% |
| 8. Military/US Government | 2 | 0.4% |
| 9. Other | 15 | 2.7% |
| 0. Don't Know | 169 | 30.7% |
| | 550 | 100% |

101. Chart 1 below summarizes the results of the survey across the two conditions. Statistical tests comparing the observed differences in proportions of confusion were run identifying statistically significant differences between the scores observed in the two conditions ($p<.001$).



Chart 1: A Comparison of Confusion across Condition

102. Table 3 below provides the verbatim responses of test condition respondents who were confused as to source, sponsorship, or business affiliation (all responses are unedited for spelling, punctuation, or grammar).

| | Table 3 | | | |
|---|---|---|---|---|
| | Verbatim Responses of all Confused Test Condition Participants | | | |
| Resp ID | Who Sourced, Sponsored, or is Affiliated? | Why do you say that? | What else, if anything, makes you say that? | What Other Products? |
| 6 | hummer | because it looks like an older model hummer | the winch package on the back..standard for hummers | not sure |
| 15 | GM | Because I believe General Motors makes the Hummer | nothing else | Chevy |
| 16 | hummer | it looks like a hummer | | hum v |
| 17 | Hummer | Looks like a hummer. | Wheels - large frame | Don't know enough about the company to know |
| 18 | Hummer | It looks like a Hummer | | Other vehicles |
| 19 | GM | I BELEIVE GM MAKES THE HUMMER | NOTHING | ENVOY,MINI VANS, PICKUP TRUCKS, AND SOME CARS |
| 20 | hummer | i recognize the body style | nothing | not aware of any |
| 21 | GM | Gm makes hummers | Just remember that GM bought hummer | GMC,Chevy ,Pontaic,Olds Now Gone, CadillaicSaturn,Saab |
| 22 | Hummer | It looks like one. | | vehicles |
| 23 | Hummer | It looks like a hummer | | I don't know |
| 25 | GM | Hummer is a brand of vehicle under the umbrella of General | it just is | Chevrolet, Buick, Volvo, Saab, Kia |

| Resp ID | Who Sourced, Sponsored, or is Affiliated? | Why do you say that? | What else, if anything, makes you say that? | What Other Products? |
|---|---|---|---|---|
| | | Table 3 | | |
| | | Verbatim Responses of all Confused Test Condition Participants | | |
| | | Motors | | |
| 26 | Hummer | It resembles a Hummer | The shape of the vehicle, the placement of the headlights | I don't know |
| 27 | Hummer | Because it looks like a hummer | The shape and the appearance of the car. | I didn't think they made any other vehicle. |
| 32 | Hummer | it looks like a Hummer | nothing | other SUV vehicles |
| 34 | hummer | it looks like a hummer | don't know | don't know |
| 35 | General Motors | It is a Hummer and General Motors produces Hummers | | Chevy's, GMC, Buick, Pontiac, Cadillac. |
| 37 | gm | looks like a hummer | n/a | chev,buick,cadillac,pontiac,saturn |
| 39 | GM | Because it looks like a Hummer | I have seen it on the road and know someone who owns one | Caddy, chevy, corvette. |
| 40 | Hummer | Looks like the Hummer H3 or a HumV | N/A | GM, Chevy |
| 43 | Hummer | Because it is shaped like one. | Has a square boxy shape. | Hum V's |
| 44 | Hummer | It looks like a Hummer. | Nothing else | Hummers |
| 61 | Hummer | It looks like one. | Nothing. | I don't know. |
| 66 | general motors | it looks like hummer | body style | a variety of automobiles |
| 72 | hummer | it looks like one or its some kind of chineese knock off | nothing | h2 and h3 and a pickup they are part of general motors |
| 74 | Hummer | It looks like an old one. | nothing | H2 and H3. |
| 76 | Humvee | Because it is a hummer. | It looks like a hummer. | No clue. |
| 77 | gm, hummer | It appears to be an H1, military spec hummer...gm chassis | | chevy, gmc |
| 81 | GMC HUMMER | Because it looks very much like the military vehicles that HUMMER makes for them. HUMMER is now owned by GMC to the best of my knowledge and they too make a fancier more dressed up model of this vehicle called the H3 I believe it is.. I know that they make an H2 and an H3 for sure. One of them lists for approximately $50,000.00 and the other is roughly $100,000.00. I have looked at both of them in months gone by and I believe that the H3 is the Larger more expensive model, but I could have them reversed. | Just what I have seen and read and what mental images I have to compare it to.. | GMC is I guess the company here to which you refer, and they make all of the cars and trucks and SUV's, etc., that fall under the names of GMC, Cadillac, Chevrolet, Pontiac, Buick, Oldsmobile. .. |
| 93 | hummer | it looks like the older hummer model. | don't know | A newer line of Hummers, the H series. |
| 94 | hummer | because it looks like an extended hummer | n/a | none that i am aware of |
| 95 | hummer | its a hummer | nothing | ???? |
| 104 | hummer | because it looks like a hummer, but older than the H2 | flat low center of gravity and wide tires. | dont know |
| 105 | hummer | because they make hummers | nothing | not much else |
| 109 | Hummer | It looks like their type of product. | experience | A few different SUVs |
| 117 | hummer | It looks like a hummer vehicle | nothing | do not know |
| 120 | Hummer | It's so plain.... The windows are huge and square like Hummers, has the same body, same side doors. | That's all I see around here ...just looks like a box. | Hummer and H2 and H3,etc. |

# Table 3
## Verbatim Responses of all Confused Test Condition Participants

| Resp ID | Who Sourced, Sponsored, or is Affiliated? | Why do you say that? | What else, if anything, makes you say that? | What Other Products? |
|---|---|---|---|---|
| 122 | Hummer | Not sure of the company name, but the product looks like a hummer. | Not sure | Don't know. |
| 123 | Hummer | It looks like a hummer | | don't know |
| 124 | hummer | looks like it | | military as well as civilian vehicles |
| 127 | Hummer | The car showed is a Hummer | Nothing | I don't know |
| 130 | Hummer | It's a Hummer! | It looks like a Hummer! | The H2, the H3, the Hummer Limousine |
| 133 | hummer | looks like their product | | hum vees |
| 136 | Hummer | Looks like past products | | Don't know |
| 137 | Hummer | Because it is an AMC Hummer based off the military model for civilian recreation | none | Hummers only |
| 138 | hummer | it looks like a miliary 4x4 vehicle | hummer and this vehicle look similar | don't know |
| 139 | hummer | it looks like one | n/a | none |
| 140 | Hummer | Because it looks like a hummer | Hummer | The Goverment |
| 144 | Hummer | It looks like a Hummer | That's it. | I think they are affiliated with Chrysler but I'm not sure |
| 146 | hummer | because it is a hummer vehicle | i want a hummer | hummer h2 and h3 |
| 148 | GM | It is a Hummer H1, that is made in Elkhart IN, by GM | nothing | other GM brands: GMC, Chevrolet, Pontiac, Buick, and they also provide millions of dollars a day in health insurance. |
| 153 | Hummer | That was the Car your taking about | Old Hummer | none |
| 158 | hummer | it looks like an older hummer | just the way it looks | h2, h3 |
| 159 | HUMMER | BECAUSE IT IS A HUMMER | IT IS A HUMMER | H2....H3 |
| 160 | General Motors | It is a Hummer, which is a division of GM | Nothing | Chevy, Pontiac, Oldsmobile, GMC, Buick, Cadillac |
| 163 | gm | because gm makes hummers | nothing | cars and trucks |
| 165 | hummer | It looks like a hummer | na | dont know |
| 167 | hummer | cuz its a hummer | nothin' | other cars |
| 174 | Hummer | It looks like a Hummer. | I know what a Hummer looks like. | Bicycles |
| 180 | hummer | looks like one | nothing | dont know |
| 186 | hummer | It looks like very similar to the hummer ive seen | the shape of the suv | dont know |
| 187 | Hummer | It appeared to be a Hmmer to me. | Nothing really. | Nothing |
| 189 | hummer | it looks like a hummer | nothing | trucks/suvs for the public |
| 191 | hummer | it looks like a hummer | the style | dont know |
| 192 | jeep | the front of the vehicle looks like the front of a jeep | nothing else | hummer's |
| 194 | hummer | looks like one, seen them before | driven one | well this a gm product, so threre many chevy, saturn, etc. |
| 195 | Hummer | Because it is a Hummer, but I do not know what specific company puts it out. | Nothing | I dunno |
| 197 | Hummer | Because it is a Hummer | Because it is a &$(%*&#^%& Hummer!!! | Other Hummers |
| 199 | Hummer | That is the only name I've seen attached to that vehicle. It is the original hummer, the original from the military. | | Don't know |
| 201 | GM | GM is the producer of HUMMER. | | Pontiac, GMC, Cadillac, Chevrolet |
| 202 | General Motors | The pictures displayed are of a Jeep Hummer, I think. I thought GM owned the Jeep | Nothing | Don't know |