IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

\* \* \* \* \* \* \* \* \*

GENERAL MOTORS COMPANY,  )
                         )  Civil No. 2:06-CV-00133 BSJ
            Plaintiff,   )
                         )  **MEMORANDUM OPINION**
vs.                      )
                         )
URBAN GORILLA, LLC, a Utah limited  )   ┌─────────────────────────────┐
liability company,       )          │  **FILED**                  │
                         )          │  CLERK, U.S. DISTRICT COURT │
            Defendant.   )          │  December 27, 2010 (12:30pm)│
                         )          │  DISTRICT OF UTAH           │
                                    └─────────────────────────────┘

\* \* \* \* \* \* \* \* \*

Plaintiff General Motors Company ("GM") seeks injunctive relief against defendant

Urban Gorilla, LLC ("Urban Gorilla") for various trademark and trade dress infringement and

dilution claims under the United States Trademark Act of 1946 (the "Lanham Act"), 15 U.S.C. §

§ 1114(1), 1125(a) and 1125(c), and trademark infringement at common law.  GM asserts that

Urban Gorilla's "body kits" and marketing related to the kits infringe upon and dilute GM's

Hummer trademarks and trade dress.  Urban Gorilla responds that the defenses of laches and

acquiescence bar injunctive relief and the awarding of costs and attorney's fees.  Counterclaims

by Urban Gorilla were dismissed upon the stipulation of counsel.[1]

The matter was argued before this Court from September 22, 2008 through September 25,

2008 and reserved by the Court.[2]  Supplemental briefs were requested by the Court and

---

[1] (Minute Entry, dated Dec. 1, 2006 (dkt. no. 81).)

[2] (Trial Transcript, Sept. 25, 2008 (dkt. no. 165) ("Tr. Sept. 25 a.m."), at 570:1.)

1

subsequently filed in February 2010 before further argument was heard on February 24, 2010.[3]

Additional supplemental briefs addressing a different question were filed at the request of the

Court in June and July 2010.

Appearing on behalf of the plaintiff General Motors Company were Gregory D. Phillips,

Scott R. Ryther and Thomas R. Lee of Howard Phillips & Andersen. Appearing on behalf of the

defendant Urban Gorilla were Jeremy G. Knight, Peter H. Barlow and Stephen J. Traynor of

Strong & Hanni.

This Court has jurisdiction pursuant to 28 U.S.C. § 1338(a) which provides the district

courts with jurisdiction over actions arising under federal trademark laws, and 28 U.S.C. § 1367

which provides for supplemental jurisdiction of the state law claims in this action. Venue is

proper under 28 U.S.C. § 1391.

Having heard and considered the arguments advanced by counsel, and having reviewed

the briefs and record in this case as well as the pertinent authorities, this Court now rules as

follows: (1) the 2006 amendments to 15 U.S.C. § 1125(c) should be applied to this case; (2)

Urban Gorilla's body kits and related marketing are likely to cause dilution by blurring of the

Hummer trademarks and trade dress; (3) some of Urban Gorilla's body kits infringe on the

Hummer trade dress; (4) Urban Gorilla's laches and acquiescence defenses fail; and (5) no costs

and attorney's fees should be awarded.

---

[3] (Notice and Order, filed Jan. 22, 2010 (dkt. no. 181); Plaintiff GM's Response to Order for Further
Argument on October 2006 Amendment to 15 U.S.C. § 1125(c), filed Feb. 5, 2010 (dkt. no. 182); Defendant Urban
Gorilla L.L.C.'s Memorandum in Response to Order for Further Argument Re: 2006 Amendment to 15 U.S.C. §
1125(c), filed Feb. 2, 2010 (dkt. no. 183); Minute Entry, dated Feb. 24, 2010 (dkt. no. 185).)

# I. Facts

During Operation Desert Storm in 1991, the military Humvee gained national attention. The Humvee's manufacturer, AM General Corporation ("AM General"), created a civilian version of the vehicle called the Hummer.[4]  General Motors Corporation ("GM Corp") purchased the trademark rights to the Hummer from AM General in 1999.[5]  The rights were sold and transferred to GM following GM Corp's filing of Chapter 11 bankruptcy and this Court granted GM Corp's Motion for Substitution of Plaintiff.[6]  GM has a registered trademark in the shape and design of the H1 model of Hummer, the Hummer nose and grill area, the word "Hummer," and the slogan "Like Nothing Else."[7]

The Hummer H1 costs approximately $140,000 and other models cost less.[8]  Production of the H1 ceased in approximately 2006.[9]  Other Hummer models continue to be sold and GM obtains substantial revenue from licensing the Hummer trademarks.[10] GM has spent millions of dollars marketing the Hummer line in print pieces, on television, on the internet, at dealerships, and through event oriented promotions.[11]

---

[4] *General Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1224 (10th Cir. 2007).

[5] (*See* Pretrial Order, filed Sept. 15, 2008 (dkt. no. 141), at 9.)

[6] (Order Granting Motion for Substitution of Plaintiff, filed Sept. 1, 2009 (dkt. no. 179).)

[7] (*See* Pretrial Order, at 9-10; Registration No. 1,959,544 (nose and grill), Registration No. 2,969,972 (wagon-style Hummer trade dress), Registration No. 3,070,072 (softtop-style Hummer trade dress); Registration No. 1,730,936 (Hummer name), Registration No. 2,696,730 (Like Nothing Else tagline).

[8] *Urban Gorilla*, 500 F.3d at 1224; (Trial Transcript, Sept. 24, 2008 (dkt. no. 167) ("Tr. Sept. 24 a.m."), at 410:11-12.)

[9] (Trial Transcript, Sept. 22, 2008 (dkt. no. 169) ("Tr. Sept. 22 a.m."), at 46:7-10.)

[10] (Tr. Sept. 22 a.m., at 45:5-46:2; Plaintiff GM's Response to Order Dated May 10, 2010, filed Jun. 1, 2010 (dkt. no. 187), at 4.)

[11] (Tr. Sept. 22 a.m., at 37:19-38:1.)

In 1997, Active Power, Inc. ("Active Power"), the predecessor in interest to Urban Gorilla, launched the Urban Gorilla product line.[12]  Urban Gorilla purchased the product line from Active Power in February 2004 and continues to produce and market the line.[13]  The Urban Gorilla product line consists of steel and fiberglass "body kits" which customers install on an existing truck chassis (known as a "donor").[14]  The body kits cost approximately $10,000.[15] Between 1997 and 2004, approximately 85 Urban Gorilla body kits were manufactured and sold by Active Power.[16]  An additional estimated 18 to 19 civilian kits were sold between 2004 and 2008 by Urban Gorilla.[17]

Urban Gorilla's kits have been advertised in print and on the internet since 1997.[18] Additionally, one kit was featured on a television show called 'Xtreme 4x4' in 2005.[19]  Urban Gorilla does not use dealerships to sell its products.[20]

On October 6, 1998 after viewing promotional materials for the Urban Gorilla body kits, AM General sent Active Power a cease-and-desist letter suggesting that the kits infringed on its Hummer trademarks.[21]  The letter specifically referenced AM General's registered trademarks

---

[12] (Trial Transcript, Sept. 22, 2008 (dkt. no. 162) ("Tr. Sept. 22 p.m."), at 145:7-12.)

[13] (Tr. Sept. 22 p.m., at 156:15-20;  (Trial Transcript, Sept. 23, 2008 (dkt. no. 163) ("Tr. Sept. 23 p.m."), at 285:9-10; Tr. Sept. 24 a.m. (dkt. no. 167), at 426:12-22.)

[14] *Urban Gorilla*, 500 F.3d at 1225.

[15] (Trial Transcript, Sept. 22 p.m. (dkt. no. 162), at 148:14-16.)

[16] (Tr. Sept. 22 p.m. (dkt. no. 162), at 145:5-15.)

[17] (Tr. Sept. 24 a.m., at 427:8-9.)

[18] (*See* Tr. Sept. 24 a.m., at 429:5-6; Tr. Sept. 22 p.m., at 149:13-19, 164:14-17.)

[19] (*See* Plaintiff's Exhibit P61.)

[20] (Tr. Sept. 24 a.m., at 431:14-16.)

[21] (Defendant's Exhibit D27 ("D27"), at "Exhibit 4".)

"Humvee," "Hummer," and the "Hummer vehicle Nose Design."[22] In response to that letter, Active Power agreed to change its product design to address AM General's concerns.[23] AM General requested to review "formal documentation" of the proposed changes.[24] Neither party produced conclusive evidence that Active Power or Urban Gorilla provided, or that AM General or GM received the changes made to the product design.[25] It is undisputed, however, that changes were in fact made to the nose and grill of the Urban Gorilla body kit and that Active Power's use of surplus Hummer parts in its kits was discontinued.[26] There is no record of contact between the parties or their predecessors-in-interest after these exchanges in 1999 until 2006.

On February 13, 2006, GM filed its complaint against Urban Gorilla and concurrently filed a motion for preliminary injunction.[27] The motion was denied because at the time and on the record before this Court, there was insufficient evidence to warrant a preliminary injunction.[28] GM appealed and the appellate court upheld the denial.[29]

## II. Discussion

### A. Retroactivity of 2006 Amendment to 15 U.S.C. § 1125(c)

The Federal Trademark Dilution Act ("FTDA") was amended by the Trademark Dilution

---

[22] (*Id.*)

[23] (Defendant's Exhibit D27 ("D27"), at "Exhibit 4".)

[24] (*Id.*)

[25] (Tr. Sept. 23 p.m., at 332:10-11 and 337:5-8; Nabozny Dep., May 23, 2007, in Tr. Sept. 23 p.m., at 353:9-12; Hunt Dep., May 21, 2007, in Tr. Sept. 23 p.m., at 370:15-17.)

[26] (Trial Transcript, Sept. 22, 2008 (dkt. no. 162) ("Tr. Sept. 22 p.m."), at 163:9, 13; Tr. Sept. 23 p.m., at 330:25 - 331:1-2.)

[27] (Complaint, filed Feb. 13, 2006 (dkt. no. 1); GM's Motion for Preliminary Injunction, filed Feb. 13, 2006 (dkt. no. 3).)

[28] (Order on GM's Motion for Preliminary Injunction, filed May 12, 2006 (dkt. no. 32), at 2.)

[29] *See Urban Gorilla*, 500 F.3d at 1224.

Revision Act ("TDRA") effective Oct. 6, 2006 in response to the U.S. Supreme Court's decision in *Moseley v. V Secret Catalogue*, 537 U.S. 418, 433 (2003). 151 Cong. Rec. H2121, H2122 (Apr. 19, 2005) (statement of Rep. Jim Sensenbrenner). In *Moseley* the court held that actual dilution, as opposed to a likelihood of dilution, was required for the court to provide injunctive relief to the owner of a famous mark. *Id.* at 433. The amended § 1125(c)(1) now calls for a relaxed "likelihood of dilution" standard. 15 U.S.C. § 1125(c)(1). Before examining the issue of dilution this Court must determine which standard should be applied in this case. I conclude that the 2006 amendments to § 1125(c) apply and GM must therefore, in addition to the other elements of dilution, prove that a likelihood of dilution exists.

In *Landgraf v. USI Film Products* the U.S. Supreme Court laid out a two-part test to determine whether a statute should be applied retroactively. *Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994). First, the court must determine whether the language of the statute expressly "prescribes the statute's proper reach." *Id.* Clear congressional intent favoring retroactivity overrides the traditional presumption against it. *Id.* Second, if the statute has no express command "the court must determine whether the new statute would have retroactive effect, *i. e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.*

The U.S. Supreme Court has also held that "relief by injunction operates in futuro" and therefore, the law in effect at the time of the hearing should be applied. *American Steel Foundries v. Tri-City Cent. Trades Council*, 257 U.S. 184, 201 (1921). Thus, even absent clear congressional intent, where a party calls for prospective relief the legislation currently in effect

should be applied because prospective relief by definition has no retroactive effect—it is forward looking relief. *Viacom Inc. v. Ingram Enters.*, 141 F.3d 886, 888 (8th Cir. 1998).

Whether the amended portion of § 1125(c)(1) should be applied to a case filed before the amendments took effect appears to be a question of first impression in this circuit. This question has been addressed, however, in at least four other circuits.[30] The courts have uniformly applied the law in effect at the time of trial.[31] The rationale behind these decisions is that when an "intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive." *Landgraf*, 511 U.S. at 273. Thus, the U.S. Supreme Court has spoken on this issue. Additionally, the Tenth Circuit has acknowledged that

> the presumption against retroactivity does not apply in certain circumstances. When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive because relief by injunction operates in futuro and plaintiff has no "vested right" in the decree entered by the trial court.

*Jurado-Gutierrez v. Greene*, 1999 U.S. App. LEXIS 30711, *36 (10th Cir. 1999). Accordingly, it is proper for this Court to apply the new standard set forth in § 1125(c)(1) requiring a plaintiff seeking injunctive relief to show only that a "likelihood of dilution" exists. 15 U.S.C. § 1125(c)(1).

---

[30] Courts of Appeals that have addressed the issue of retroactivity of the 2006 amendments include the Second, Fourth, Eighth, and Ninth Circuits.

[31] *See*, *e.g. Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 477 F.3d 765, 766 (2d Cir. 2007) ("The amended statute applies to this case to the extent that Starbucks has sought injunctive relief on the issue of dilution."*); Jada Toys, Inc. v. Mattel, Inc*., 518 F.3d 628, 634 (9th Cir. 2008) ("application of the FTDA to an alleged diluting mark that was in use before the statute's passage was not retroactive because the FTDA authorizes only prospective relief"); *Vuitton Malletier S.A. v Haute Diggity Dog, LLC*, 464 F Supp 2d, 495 (E.D. Va.. 2006) (even though plaintiff's dilution claim was filed before Trademark Dilution Revision Act of 2006, the amended statute applied because plaintiff sought injunctive relief on issue of dilution); *Viacom Inc. v. Ingram Enters.*, 141 F.3d 886, 889 (8th Cir. 1998) (quoting *Landgraf* and finding that "an intervening statute may 'authorize[ ] . . . prospective relief' without running afoul of the traditional presumption against retroactivity.").

Whether to apply the amended § 1125(c)(1) where a plaintiff seeks the additional remedies listed in § 1125(c)(5) is a separate matter because the remedies referenced in (c)(5) include non-prospective relief. Therefore, applying the test articulated in *Landgraf*, the language of the statute and congressional intent must be examined. *Landgraf*, 511 U.S. at 280. Section 1125(c)(5) unambiguously states that the remedies set forth in § 1117(a) (relating to profits, damages, costs, and attorney's fees) are available under the amended standard only if:

> (A) the mark . . . that is likely to cause dilution . . .was *first used in commerce* by the person against whom the injunction is sought *after October 6, 2006*; and
> (B) in a claim arising under this subsection—
> (i) by reason of dilution by blurring, the person against whom the injunction is sought *willfully* intended to trade on the recognition of the famous mark;

15. U.S.C. § 1125(c)(5) (emphasis added). Therefore, to determine what "additional remedies" are available for claims where the mark was first used in commerce prior to October 6, 2006, the previous version of the statute must be examined.

Neither party disputes that this lawsuit was initiated on February 13, 2006, that the Urban Gorilla body kits were being produced and sold in commerce prior to October 6, 2006, or that GM is seeking injunctive relief, costs, and attorney's fees.[32] With regard to GM's request for injunctive relief, the amended version of 2006 will be applied because an injunction operates *in futuro* and therefore no retroactivity problem exists. Prospective relief is not punishment for past behavior; rather, it prevents future unlawful behavior. In contrast, the previous § 1125(c)-which requires actual dilution of a famous mark – must be applied to determine whether it is appropriate to award costs and attorney's fees for any past behavior by Urban Gorilla because the allegedly offending behavior occurred before October 6, 2006.

---

[32] (Complaint, filed Feb. 13, 2006 (dkt. no. 1), at 13-15.)

**B. Trademark Dilution**

A person may plead a private civil cause of action for dilution of a famous mark by blurring.[33] 15 U.S.C. § 1125(c). To establish such a claim and to be entitled to injunctive relief (subject to principles of equity) under the TDRA, a plaintiff must show: (1) its mark is famous; (2) its mark is distinctive; (3) the defendant began using its mark or trade name after the plaintiff's mark became famous; (4) the defendant's use of his mark is in commerce; and (5) the defendant's mark must be likely to cause dilution to the plaintiff's mark. 15 U.S.C. § 1125(c)(1).

This case deals with both trademark and trade dress dilution claims. Because the Hummer trademarks and trade dress in issue are all registered marks there are no differences in the elements that must be proven by the plaintiff.[34]

*(1) Plaintiff's Mark Must be Famous*

A "mark is famous if it is widely recognized by the general consuming public . . . as a designation of source of the goods . . . of the mark's owner." 15 U.S.C. § 1125(c)(2). All relevant factors may be considered including:

> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
> (iii) The extent of actual recognition of the mark.
> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register

---

[33] There is also a cause of action for dilution by tarnishment but neither party presented evidence related to tarnishment.

[34] If the trade dress were not registered, the plaintiff would be required to also prove that the dress is not functional and that it is famous. 15 U.S.C. § 1125(c)(4).

15 U.S.C. § 1125(c)(2).

GM and its predecessors-in-interest have used various Hummer trademarks and trade dresses continually since at least 1992.[35]  Several of the Hummer trademarks are registered with the U.S. Patent and Trademark Office.[36]  The company has spent hundreds of millions of dollars advertising Hummer products in print, on television, online, at the point of sale, and at events.[37]  Promotion of the brand has been world-wide.[38]  Many of the Hummer marks are licensed to other companies for non-automotive products such as golf carts and toys.[39]  These licensed products results in over $2 billion in revenue to GM annually.[40]

Additionally, in preparation for this trial Dr. Glenn Christensen, an expert witness for GM, designed and completed a survey to examine confusion in the marketplace regarding the Urban Gorilla body kits.  The survey asked participants to answer a series of questions related to visual stimuli.[41]  Participants were either shown pictures of an assembled Urban Gorilla body kit or pictures of another military style, 4x4 vehicle (the control stimulus).  Without the aide of brand identifiers, such as a Hummer logo or use of the word Hummer in the survey question, several participants typed the word "Hummer" into the response field.[42]

GM's long-time use of the Hummer marks, coupled with its extensive advertising efforts

---

[35] (Complaint, at 4; See Plaintiff's Exhibit P1-1 to P1-22 (*see* date of first use in commerce).)

[36] (Pretrial Order, filed Sept. 15, 2008 (dkt. no. 141), at 9-10; *See also* Plaintiff's Exhibits P1-1 to P1-22.)

[37] (Tr. Sept. 22 a.m. (dkt. no. 169), at 37:19-38:1.)

[38] (Pretrial Order, filed Sept. 15, 2008 (dkt. no. 141), at 10.)

[39] (Tr. Sept. 22 a.m. (dkt. no. 169), at 45:5-18.)

[40] (*Id*. at 45:25 - 46:2.)

[41] (Tr. Sept. 23 a.m. (dkt. no. 156), at 27:4-28:6.)

[42] (Plaintiff's Exhibit P12, at 63.)

throughout the United States, supports a finding that the marks are famous. Based on the revenue generated, the volume of sales of products using the Hummer marks is substantial. Additionally, the survey results suggest high levels of actual recognition of the Hummer marks. Over 71% of participants were able to produce the names GM or Hummer when shown an image of a boxy, military-style vehicle. Thus, consumers know these marks by look and name.

Urban Gorilla does not appear to challenge the assertion that the Hummer marks and trade dress are famous. Thus, the evidence overwhelmingly supports such a finding.

### (2) Plaintiff's Mark Must be Distinctive

"The owner of a famous mark *that is distinctive, inherently or through acquired distinctiveness*, shall be entitled to an injunction . . ." 15 U.S.C. § 1125(c)(1) (emphasis added). To determine the meaning of the statute courts must first look to the plain language of the statute. *Arlington Central School Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 296 (2006). Where Congress unambiguously expresses its intent, the courts must give effect to that intent. *Atl. Mut. Ins. Co. v. Comm'r*, 523 U.S. 382, 387 (1998). However, where the statutory language is ambiguous the courts may look to the legislative history of the statute, public policy, and the broader statutory scheme to ascertain congressional intent. *Singh v. Superior Court*, 140 Cal. App. 4th 387, 393 (Cal. App. 2d Dist. 2006).

The plain language of the statute in this case is far from unambiguous. Although the statute essentially defines "famous" by providing a list of factors for consideration, it does not define "inherent" or "acquired distinctiveness." Thus, I must examine extrinsic sources to determine what the legislature intended when it added the phrase "distinctive, inherently or through acquired distinctiveness . . ." to § 1125(c).

The legislative history of the TDRA offers little guidance as to the meaning of "distinctiveness." Although confusion about term's definition is acknowledged, the legislative history fails to elaborate on how the TDRA has "more clearly" defined the term. 152 Cong. Rec. H6963, H6965 (Sept. 25, 2006) (statement of Rep. Lamar Smith).

In contrast, the broader statutory scheme provides significant incite. "Distinctiveness" is a term commonly used throughout Title 15, Chapter 22 of the United States Code, which deals with trademarks. For example, § 1052 provides for registration of trademarks that have become distinctive through use in commerce. 15 U.S.C. § 1052(f). Additionally, proof of either inherent distinctiveness or acquired distinctiveness (also known as secondary meaning) is a required element in a trademark infringement claim.[43] *General Motors Corp. v. Urban Gorilla, LLC*., 500 F.3d 1222, 1227 (10th Cir. 2007). Therefore, the essential question here is whether distinctiveness in the dilution context mirrors that of dilution in other trademark contexts.[44] I find that it does.

Prior to 2006 distinctiveness was a factor, but not an element, in a dilution by blurring claim. Federal Trademark Dilution Act of 1995, § 3(a), Pub. L. 104-98, 109 Stat. 985, 985-986 (current version at 15 U.S.C. § 1125(c)(2006) ("FTDA 1995 § 3(a)").) The prior § 1125(c)(1) began "The owner of a famous mark . . ." FTDA 1995 § 3(a). Today's § 1125(c)(1) reads "the

---

[43] The distinctiveness requirement is derived from 15 U.S.C. § 1127 which defines a trademark as "any word, name, symbol, or device or any combination thereof used by a person . . . to identify and *distinguish* his or her goods . . ." 15 U.S.C. § 1127 (emphasis added). Thus, where a mark does not distinguish the product, the mark is not distinctive. *See Two Pesos v. Taco Cabana*, 505 U.S. 763, 768 (1992).

[44] This ambiguity is noted in a statement by William G. Barber, President and Chairperson of the American Intellectual Property Law Association, ("AIPLA") to the Committee on House Judiciary Subcommittee on Courts, The Internet, And Intellectual Property on February 17, 2005. Mr. Barber, on behalf of the AIPLA, proposed an amendment to H.R. 683 which would have limited the use of the term "distinctiveness" to within a single factor to determine whether dilution by blurring exists. This suggestion was apparently rejected as it does not appear in the final version of the bill or the codified statute.

owner of a famous mark that is distinctive, inherently or through acquired distinctiveness . . ." 15 U.S.C. § 1125(c)(1). Thus, Congress has added distinctiveness as an element of a dilution claim. Furthermore, given the broader statutory context and traditional meaning of "distinctive" in the trademark context, I hold that Congress's addition of the phrase "inherent and acquired distinctiveness" to § 1125(c)(1) signaled its intention to give traditional meaning to those terms. Accordingly, trademark infringement cases that explore the contours of inherent distinctiveness and secondary meaning are highly relevant here because they provide incite on the traditional meaning of distinctiveness.

A "certificate of registration of a mark upon the principal register" is prima facie evidence of the mark's validity. 15 U.S.C. § 1057(b) (2006); *Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 545 (10th Cir. 2000). The presumption of validity extends to the distinctiveness of the registered mark and also its nonfunctionality. *Publications Int'l v. Landoll*, 164 F.3d 337, 340 (7th Cir. 1998); *Sally Beauty Comp. v. Beautyco, Inc.*, 304 F.3d 964, 976 (10th Cir. 2002). However, the presumption of validity is rebuttable and when questioned the validity must be established. *National Nu Grape Co. v. Guest*, 164 F.2d 874, 875 (10th Cir. 1947).

GM's dilution claim extends to all of its registered Hummer marks including various uses of the Hummer name, the Hummer tagline "Like Nothing Else," and the Hummer H1 trade dress.[45] Because GM holds registrations to all of these marks it is therefore entitled to a presumption that the marks are distinctive absent evidence to the contrary. Urban Gorilla presents evidence to rebut the presumption with regard to the trade dress only. Therefore, I hold that GM's trademarks of the Hummer name and tagline are distinctive.

---

[45] (Complaint, at 1.)

Moving on to the challenged distinctiveness of the Hummer trade dress, the term trade dress refers to the overall appearance of a product. *Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1271 (10th Cir. 1988) ("*Hartford House II*"); *Brunswick v. Spinit Reel*, 832 F.2d 513, 517 (10th Cir. 1987). The "trade dress may be a composite of several features in a certain arrangement or combination which produces an overall distinctive appearance." *Hartford House II*, F.2d at 1272.

A mark [or dress] is inherently distinctive if its "intrinsic nature serves to identify a particular source of a product . . ." *Two Pesos v. Taco Cabana,* 505 U.S. 763, 768 (1992). This includes marks which are suggestive, arbitrary, or fanciful on Judge Friendly's scale of distinctiveness. *Id.* Marks which are merely descriptive on the Friendly scale are not inherently distinctive, but may acquire distinctiveness through secondary meaning. *Id.* at 769.

"To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Labs. v. Ives Labs.*, 456 U.S. 844, 851 n.11 (1982). Essentially, the plaintiff must show that in the consumer's mind a particular trade dress indicates a "single thing coming from a single source." *Sally Beauty*, 304 F.3d at 978. Evidence of actual confusion is probative of secondary meaning. *Vail Assocs. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853, 866-867 (10th Cir. 2008). To establish secondary meaning, a plaintiff may present:

> circumstantial evidence regarding: (1) the length and manner of its use, (2) the nature and extent of the advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture.

*Donchez v. Coors Brewing*, 392 F.3d 1211, 1218 (10th Cir. 2004). Proof of intentional copying

is also relevant in determining whether a mark has acquired secondary meaning. *See Sally Beauty*, 304 F.3d at 978; *Hartford House v. Hallmark Cards Inc.*, 647 F. Supp. 1533, 1542 (D. Colo. 1986).

Urban Gorilla's argument that the Hummer trade dress is not inherently distinctive is an appealing one. Because the boxy shape, split windows, and high belt line in the trade dress are common to military vehicles in general, Urban Gorilla contends that the dress cannot be inherently distinctive.[46] The argument falls short, however, because distinctiveness can either be inherent *or* acquired and in this case GM has shown that the Hummer trade dress serves as a unique identifier of the source of its product and therefore it has acquired distinctiveness.

I arrive at this conclusion by applying the factors listed in *Donchez*—which are very similar to the factors examined to determine whether a mark is famous—and in light of evidence of actual confusion in the marketplace as illustrated by Dr. Christensen's survey. For nearly the same reasons that the dress is famous, it also has acquired distinctiveness. The trade dress has been used for over twenty years and has been actively promoted in connection with the Hummer product line. Moreover, GM has marketed the Hummer H1 on television, in print, online, and at events and has spent several hundreds of millions of dollars doing so. Finally, Dr. Christensen's survey indicates a rate of actual confusion of over 50 percent which supports the inference that the mark has acquired secondary meaning.

Although GM argues that Urban Gorilla intentionally copied the Hummer trade dress, I am not compelled by the arguments. The designer of the original Urban Gorilla body kit

---

[46] (Tr. Sept. 25 a.m., at 550:7-24.)

concedes that it was intended as a "replica."[47]  However, Urban Gorilla's predecessor in interest made several changes to the body kits upon learning of concerns of the mark's then owner, AM General.  Specifically, the nose and grill area was redesigned and the company ceased use of surplus Humvee parts in its products.[48]  When Urban Gorilla purchased the product line it made several dozen more changes to the design.[49]  These facts illustrate Urban Gorilla's efforts to distinguish its products rather than to copy GM's.

### (3) Defendant's Use of its Mark Began After the Owner's Mark Became Famous

The Hummer trademarks and dress became famous in the early 1990s after the military Humvee gained national attention during Operation Desert Storm in 1991.[50]  Active Power, Urban Gorilla's predecessor in interest, began production and marketing of its body kits in 1997.[51]  The defendant's use of its mark was thus approximately six years after the Hummer trademarks and trade dress became famous.

### (4) Defendant's Mark Must be Used in Commerce

"Urban Gorilla manufactures, markets, and sells 'body kits,' which are designed to be installed on a 'donor chassis.'"[52]  The body kits have been sold to civilian and military customers

---

[47] (Tr. Sept. 22 p.m. (dkt. no. 162), at 146:7.)

[48] (Tr. Sept. 22 p.m. (dkt. no. 162), at 148:23-149:1 and 150:23-24.)

[49] (Tr. Sept. 25 a.m. (dkt. no. 165), at 558:2-5; Tr. Sept. 24 a.m., at 438:10-441:19 and 453:9-454:4. (Examples of changes include: (1) the modified nose and grill design; (2) twelve degree change in the slope of the windshield; (3) rounded edges of the windshield; (4) sloping on the front part of the front doors; (5) leveling of the rear windows to sit in a single plane; (6) adjustment of the side window height to match the rear window height; (7) increased size of the quarter panel mold; (8) and modifications to make Humvee and Hummer doors and hoods incompatible with the body kits.)

[50] *(General Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1224 (10th Cir. 2007).)

[51] (Tr. Sept. 22 p.m., at 149:18-19.)

[52] (Pretrial Order (dkt. no. 141), at 10.)

16

since approximately 1997.[53]  From 1997 to 2004 approximately 85 body kits had been sold.[54]  An estimated 18 additional kits have been sold to civilian customers since Urban Gorilla acquired the product line in 2004.[55]  The body kits are sold for between $7,000 and $10,000.[56]  This type of commercial sale of a product easily meets this required element.

### (5) Defendant's Mark Must be Likely to Cause Dilution of the Famous Mark

"Dilution by blurring is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). To determine whether there is a likeliness of dilution the court may consider all relevant factors including:

(i) The degree of similarity between the mark or trade name and the famous mark.
(ii) The degree of inherent or acquired distinctiveness of the famous mark.
(iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.
(iv) The degree of recognition of the famous mark.
(v) Whether the user of the mark or trade name intended to create an association with the famous mark.
(vi) Any actual association between the mark or trade name and the famous mark.

15 U.S.C. § 1125(c)(2)(B).  A mark may be likely to cause dilution regardless of "the presence or absence of actual or likely confusion, of competition, or of actual economic injury."  15 U.S.C. § 1125(c)(1).

Within trademark law there are at least two public policy concerns: (1) preventing consumer confusion and deception and (2) protecting goodwill cultivated by a mark holder in

---

[53] (Tr. Sept. 22 p.m., at 145:7-12; Tr. Sept. 24 a.m. (dkt. no. 167), at 427:6-9.)

[54] (Tr. Sept. 22 p.m., at 145:13-14.)

[55] (Tr. Sept. 24 a.m. (dkt. no. 167), at 427:8-9.)

[56] (Tr. Sept. 22 p.m., at 148:15-17; *General Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1225 (10th Cir. 2007).)

their mark.  Jeremy M. Roe, *The Current State of Antidilution Law: The Trademark Dilution Revision Act and the Identical Mark Presumption*, 57 DePaul L. Rev. 571, 573 (2008). Infringement actions primarily address the first concern, protection of public welfare.  Dilution actions, in contrast, serve primarily to protect the private mark holder's investment in developing goodwill regardless of consumer confusion.  Several scholars and courts describe dilution as the "whittling away" of distinctiveness of a mark through use of the mark on non-competing goods (a term coined by Frank Schechter in a 1927 Harvard Law Review Article).[57]

Classic examples of blurring include such "'hypothetical anomalies as Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth.'" *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 105 (2d Cir. 2009).  Frank Schechter may still offer substantial guidance in this area.  He "repeatedly emphasized that antidilution protection should be directed toward 'preservation of the uniqueness or individuality of the trademark,' its 'singularity,' its 'arresting uniqueness,' the degree to which 'it is actually unique and different from other marks.'" Barton Beebe, *Intellectual Property Law and the Sumptuary Code*, 123 Harv L. Rev. 810, 846 (2010).

**(i)** Degree of similarity between the mark or trade name and the famous mark

Strong similarity between a famous mark and the allegedly diluting mark increases the likelihood of dilution by blurring. 2-5A Anne Gilson LaLonde, *Gilson on Trademarks* § 5A.01 (2010).  Although several circuits formerly required nearly identical marks for a dilution claim, a

---

[57] *See* Frank Schechter, *Rational Basis of Trademark Protection*, 40 Harv. L. Rev. 813, 831 (1927); Barton Beebe, *Intellectual Property Law and the Sumptuary Code*, 123 Harv L. Rev. 810, 846 (2010); Jeremy Roe, *The Current State of Antidilution Law: The Trademark Dilution Revision Act and the Identical Mark Presumption*, 57 DePaul L. Rev. at 573; Robert Klieger, *Trademark Dilution: The Whittling Away of the Rational Basis for Trademark Protection*, 58 U.Pitt. L. Rev. 789, 812-813 (1997); *Moseley v. V Secret Catalogue,* 537 U.S. 418, 429 (2003).

shift towards a more relaxed similarity requirement has followed the enactment of the Trademark

Dilution Revision Act. *See, e.g., Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97,

107 (2d Cir. 2009) (holding that "the existence of some -- but not substantial -- similarity

between the subject marks may be sufficient in some cases to demonstrate a likelihood of

dilution by blurring); *Perfumebay.com Inc. v. eBay Inc.*, 506 F.3d 1165, 1181 (9th Cir. 2007)

(relaxing the similarity standard from "identical" to "essentially the same" in cases involving a

famous mark that is highly distinctive).

Only a handful of cases involving trademark dilution have been decided in the Tenth

Circuit following the amendments to § 1125(c). Of those cases only one actually discussed

dilution by blurring—the others either dealt with the pre-2006 version of § 1125(c) or were

related to dilution by tarnishment. *Gennie Shifter, LLC v. Lokar, Inc.*, 2010 U.S. Dist. LEXIS

2176 (D. Colo. 2010) (holding that summary judgment was inappropriate because the plaintiff's

mark was not "famous"). None of the cases have directly addressed degree of similarity between

the marks.

Therefore, the quantum of similarity to be weighed in a dilution by blurring analysis is a

question of first impression in this Circuit. Due to its historically important significance in a

dilution claim, this factor remains among the most critical in a the blurring analysis. That being

said, the reasoning of the Second and Ninth Circuits is sound and based on the structure—a list

of factors to consider rather than specific elements—and language—the decision of the

legislature not to use the word "substantial"—of the amended § 1125(c), a slightly relaxed

similarity standard is appropriate.

"The degree of similarity between marks turns upon sight, sound, and meaning." *Vail*

19

*Assocs. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853, 869 (10th Cir. 2008). Differences are to be weighed less heavily than similarities. *Beer Nuts v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir. 1986) ("*Beer Nuts II*"). The inquiry focuses on the overall image and impression created by allegedly infringing product rather than on a side-by-side comparison and "must be examined in the context of the marks as a whole as they are encountered by consumers in the marketplace." *Beer Nuts II*, 805 F.2d at 925; *accord, Sally Beauty*, 304 F.3d at 979.

A fair similarity analysis requires us to look at three categories of Hummer trademarks: 1) the Hummer tagline "Like Nothing Else;" 2) the trademarked name "Hummer" or "H1;" and 3) the Hummer H1 trade dress. Each will be examined in turn.

### Tagline

GM uses the tagline "Like Nothing Else" in its marketing materials for the Hummer products.[58] GM also uses the Hummer name on its products and in its promotional materials.[59] Urban Gorilla uses the tagline "When Nothing Else Will Do" in some of its advertisements for its body kits.[60]

In adopting and promoting its products with the phrase "When Nothing Else Will Do" Urban Gorilla also used a mark strongly similar to the Hummer mark "Like Nothing Else." Both phrases contain the worlds "nothing" and "else" and both are short in length and used in connection with automobiles. They also convey the similar meaning that their products are unlike any others out there.

---

[58] (Tr. Sept. 22 a.m., (dkt. no. 169), at 39:7-11.)

[59] (*Id.* at 42:17-20.)

[60] (Tr. Sept. 23 p.m. (dkt. no. 163), at 292:11-14.)

*Trade Name*

Several comparisons to the Hummer are made in marketing materials of the Urban Gorilla. Customer testimonials referencing or comparing the Hummer appear on Urban Gorilla's web site www.4x4bodies.com and the web page where the testimonials are located is titled hummer-kit-car.php.[61] There is also a notice on the web site disclaiming any affiliation or association with GM, Hummer, or several other automobile manufacturers.[62]

Despite the disclaimer, the terms "Hummer", "H-1," "H-2," and "H-3" were found in approximately 1,400 emails produced by Urban Gorilla.[63] Additionally, the Urban Gorilla body kits were listed as a "Military style and family Hummer-type" vehicles in the publication *Kit Car Buyer's Guide*, a third party publication which provides information on many brands of "kit cars."[64]

Although Urban Gorilla expressly disclaims any affiliation with GM and Hummer, the evidence indicates that Urban Gorilla strategically included the term Hummer in its product promotions. In some instances the Urban Gorilla body kit is being compared to the Hummer, such as on the testimonials page, which is arguably fair use;[65] however, in other instances the term "Hummer" was used to drive traffic to the Urban Gorilla web site and to describe the Urban Gorilla body kits. To the extent that Urban Gorilla used the Hummer name to describe or identify its body kits, it used a mark identical to Hummer trademarks.

---

[61] (Plaintiff's Exhibit P28.)

[62] (Pretrial Order, filed Sept. 15, 2008 (dkt. no. 141) at 8; Tr. Sept. 23 p.m. (dkt. no. 163), at 319:21-320:5.)

[63] (Tr. Sept. 22 p.m. (dkt. no. 162), at 96:4-15.)

[64] (Plaintiff's Exhibit P30, at 3.)

[65] Urban Gorilla does not make a fair use argument, but it probably could have for some aspects of its allegedly illegal conduct.

*Trade Dress*

Urban Gorilla sells body kits that customers assemble and affix to their own chassis.[66] GM sells a completed "turn key" vehicle that customers can drive off the lot without any assembly. When marketing its body kits Urban Gorilla uses images of a painted body kit installed on a chassis.[67] The original design of the Urban Gorilla body kits used Humvee surplus parts as molds for its doors and windshield frame.[68] The body kits have been significantly modified since the time of initial design.[69] Urban Gorilla produces several models of body kits including: the wagon, hard top, soft top, slant back, and combat.[70] Customers can choose two, four, or six door versions of any of these models. The registered trade dress of the Hummer H1 has four doors.[71]

To determine whether the Urban Gorilla body kits are strongly similar to the Hummer trade dress, I must first determine whether it is the raw or assembled body kits that should be compared. I hold that because Urban Gorilla uses images of completed body kits rather than simply the raw frame in its marketing materials then the assembled product must be the basis of comparison. *Beer Nuts* and *Sally Beauty* indicate the marks must be examined as they are "encountered by consumers in the marketplace" and in this case it is the assembled body kit that consumers encounter.

---

[66] (Tr. Sept. 24 a.m. (dkt. no. 167), at 436:13-20; Pretrial Order, filed Sept. 15, 2008 (dkt. no. 141), at 10.)

[67] (*See, e.g.*, Plaintiff's Exhibits P2 and P46.)

[68] (Tr. Sept. 22 p.m. (dkt. no. 162), at 159:12-14 and 160:1-4.)

[69] (Tr. Sept. 25 a.m. (dkt. no. 165), at 558:2-5; Tr. Sept. 24 a.m., at 438:10-441:19 and 453:9-454:4.)

[70] (Plaintiff's Exhibit P2, at 4.)

[71] (*See* Plaintiff's Exhibit P1-1 and P1-2.)

There are five different models of Urban Gorilla body kits and three Hummer trade dresses to compare. Across all models, the Urban Gorilla nose and grill no longer resemble that of the Hummer.[72] The remodeled nose and grill now used on the body kits have a single horizontal bar across the front center whereas the Hummer nose and grill have seven vertical bars.[73] Additionally, the Urban Gorilla appears to have a broader and more substantial front bumper.[74] Another key difference between the remodeled Urban Gorilla body kit and the Hummer is the change in the power dome.[75] Unlike the vented power dome seen on the Hummer, the Urban Gorilla body kits now have a single or double vent dome that does not have the same washboard look of the Hummer.

In spite of the different nose and grill and power dome, the Urban Gorilla wagon, soft top, and hard top versions strongly resemble the Hummer trade dresses. The overall shape and dimensions of the body kits are "Hummer-esque." The Urban Gorilla and Hummer share rectangular bodies with sharp corners, the roofs are flat and look somewhat compressed, the windows are split and have windshield wipers attached to the top of the window, and both use prominent latches on the front good. The overall impression of the Urban Gorilla, in spite of several differences, is strongly similar to the Hummer.

On the other hand, the slant back and combat models of the Urban Gorilla are not strongly similar to the Hummer trade dress. The combat version does not have any doors or a roof. The result is a more dune-buggy-esque looking Urban Gorilla. The slant back version also

---

[72] (Tr. Sept. 24 a.m. (dkt. no. 167), at 438:3-7.)

[73] (Tr. Sept. 22 p.m. (dkt. no. 162), at 148:23 - 149:1; Plaintiff's Exhibits P51 and P55.)

[74] (Plaintiff's Exhibits P51 and P55; Complaint, filed Feb. 13, 2006 (dkt. no. 1), at 2.)

[75] (Plaintiff's Exhibits P51 and P55.)

has a unique shape with a panel sloping off behind the passenger compartment toward the bumper. GM did not present evidence of similar Hummer models or registered trade dresses. In the world of automobiles where similarities run high and small variations make a big difference, these features sufficiently distinguish these models of Urban Gorilla from the Hummer trade dress.

**(ii)** Degree of inherent or acquired distinctiveness

As discussed above, the Hummer marks have acquired distinctiveness through substantial marketing efforts of GM, and as illustrated by actual confusion in the marketplace. *See supra* 11-16.

**(iii)** Extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark

Active and aggressive policing of unauthorized uses of a mark supports a finding that the owner is engaging in substantially exclusive use of the mark. *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 559 F. Supp. 2d 472, 477 (S.D.N.Y. 2008); *V. Secret Catalogue, Inc. v. Moseley*, 558 F. Supp.2d 734, 746 (W.D. Ky. 2008). Extensive advertising efforts to promote the mark are also relevant in determining substantially exclusive use. *Starbucks Corp.*, 559 F. Supp. at 477.

GM has pursued litigation related to unauthorized trademark use against Tatonka Products, Humbug, Hum J-7, "Hummer" golf cart manufacturers, toy manufacturers using the marks, and Avanti.[76] The company also sends cease and desist letters to alleged infringers.[77]

---

[76] (Tr. Sept. 22 a.m. (dkt. no. 169), at 62:11 - 63:25.)

[77] (Tr. Sept. 24 pm. (dkt. no. 164), at 503:18-504:2 and 508:20-509:5.)

These active policing efforts by GM support a finding of substantially exclusive use, as does GM's extensive marketing of the Hummer brand.

**(iv)** Degree of recognition of the famous mark

As indicated above, the Hummer trademarks are unquestionably famous. This factor asks the question, "how famous?" The answer? Very famous. Two billion dollars of revenue is generated annually from licensing of Hummer related products alone.[78] The fairly large quantity of trademark related lawsuits by GM to protect the Hummer marks also supports a finding that the marks are very famous. The inference is that the more famous the mark, the more likely others will mimic it to benefit from the goodwill associated with the mark.

**(v)** Whether the use of the mark or trade name intended to create an association with the famous mark

Whether a person "intended to create an association" with a famous mark does not require that the person acted in bad faith in creating such an association. *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 109 (2d Cir. 2009). Based on the language of the statute alone, the court is simply instructed to consider whether the defendant intended to create an association with the famous mark. 15 U.S.C. § 1125 (c).

The evidence in this case does not show bad faith on the part of Urban Gorilla in designing and promoting its products, but it does show an intent to associate its product with the Hummer line. The landing page for Urban Gorilla's web site included several customer testimonials comparing their completed body kits with Hummers.[79] The word "Hummer" and

---

[78] (Tr. Sept. 22 a.m., at 45:19-46:2.)

[79] (Plaintiff's Exhibit P21, at 10-12; Tr. Sept. 23 p.m. (dkt. no. 163), at 297:3 - 298:25.)

other related terms are used throughout the text.[80]  The file name for the testimonials web page is "hummer-kit-car.php."[81]  This name was selected by Urban Gorilla because "the hottest search terms" were "Hummer Kit, Hummer Kit Car, Hummer Replica, Humvee kit/replica, etc."[82] Therefore, Urban Gorilla sought to associate its web site with the Hummer name to drive traffic to the site.

**(vi)** Any actual association between the mark or trade name and the famous mark

"Actual" is defined as "existing in fact or reality" and "association" as the process of forming a "mental connection or bond" between "sensations, ideas, or memories."  *Webster's Third New International Dictionary of the English Language* 22 and 133 (Philip Babcock Gove ed., 1971).  Survey results showing actual confusion are one basis for establishing actual association by consumers.  *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 559 F. Supp. 2d 472, 478 (S.D.N.Y. 2008).

Several instances of actual association by customers, potential customers, and members of the general public were presented to this Court.  First, emails provided by Urban Gorilla to GM included approximately 1,400 references to one of the Hummer trademarked names.[83] Several emails are from potential customers inquiring about Urban Gorilla's "hummer wagon" or "Hummer."[84]  These emails indicate that the individuals writing them associate the Urban Gorilla with Hummer in some way.  Second, the *National Post* article sub-titled "Kit will turn your

---

[80] (Plaintiff's Exhibit P21, Tr. Sept. 23 p.m., at 300:15-20.)

[81] (Plaintiff's Exhibit P21, at 13.)

[82] (*Id.*)

[83] (Tr. Sept. 22 p.m. (dkt. no. 162), at 96:4-15.)

[84] (Plaintiff's Exhibit P22, at 31; Plaintiff's Exhibit P23, at 9.)

Chevy pickup into a Hummer - on the cheap" shows that the author associates the Urban Gorilla body kits with Hummer.[85]  Finally, in the survey by Dr. Christensen there was a high rate of actual confusion, *i.e.,* over 50 percent of the respondents thought the image they were looking at either was a Hummer or had some affiliation with GM or Hummer.[86]  The respondents to the survey associated the Urban Gorilla with GM's famous Hummer marks—they looked at a picture of an Urban Gorilla and thought "Hummer."

(vii) Conclusion on likelihood of dilution

Weighing all of relevant factors including those listed in § 1125(c)(2)(B), I find dilution by blurring is likely in several instances.  To the extent that Urban Gorilla has used the Hummer trademarked names to describe or identify its products, its use is likely to cause dilution of the Hummer marks.  However, where Urban Gorilla's advertisements or promotions permit consumers to compare its products to the Hummer, the use is protected under the fair use provision in § 1125(c)(3)(A)(i).  Also, Urban Gorilla's use of the tagline "When Nothing Else Will Do" is likely to dilute the Hummer trademark "Like Nothing Else."  Finally, the Urban Gorilla soft top, hard top, and wagon models are likely to dilute the Hummer registered trade dress.

## (6) Dilution Claim Conclusion

With respect to these Hummer marks GM has also met its burden of proving the other elements of a dilution claim including that its marks are famous, the marks are distinctive, Urban Gorilla began its use after the Hummer marks became famous, and the use was in commerce.

---

[85] (Plaintiff's Exhibits P7-6 and P10.)

[86] (Plaintiff's Exhibit P12, at 6.)

GM has not shown met the elements of a dilution claim, however, with regard to the Urban

Gorilla combat or slant back models. Therefore, those models are not likely to cause dilution of

the Hummer marks.

## C. Trade Dress Infringement

Pursuant to the Lanham Act, a person may plead a private civil cause of action for trade

dress infringement. 15 U.S.C. § 1125(a). To establish such a claim under the Act, a plaintiff

must show: (1) the trade dress is non-functional and (2) there is a likelihood of confusion among

consumers as to the source of the competing products. 15 U.S.C. §§ 1125(a)(3) and 1114(1)(a).

Additionally, the plaintiff must show that the trade dress is inherently distinctive or has acquired

secondary meaning. *General Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1227 (10th

Cir. 2007). As indicated above, registered trademarks are entitled to a presumption of

nonfunctionality and distinctiveness. *See supra* 13.

### *(1) The Trade Dress Must be Non-Functional*

Where a mark is registered, the burden to prove the mark is functional rests with the

defendant. 15 U.S.C. § 1125(a)(3); *Brunswick*, 832 F.2d at 520. "A product feature is functional

if it is essential to the use or purpose of the article or if it affects the cost or quality of the article."

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n.10 (1982). Whether a

feature of a particular trade dress is functional turns on whether "protection of the configuration

would hinder competition or impinge upon the rights of others to compete effectively in the sale

of goods." *Brunswick*, 832 F.2d at 519.

A determination of functionality should rest on "whether alternative appealing designs or

presentations of the product can be developed." *Id.* Moreover, "a combination of features may

be nonfunctional and thus protectable, even though the combination includes functional features." *Hartford House II*, 846 F.2d at 1272.

In the *Hartford House* case, the plaintiff designed a line of greeting cards containing non-occasion emotional messages concerning personal relationships. The cards were composed of paper, verse, and ink which the court held were functional features of a greeting card. *Hartford House, Ltd. v. Hallmark Cards*, 647 F. Supp. 1533, 1540 (D. Colo. 1986), *aff'd*, 846 F.2d 1268 (10th Cir. 1988). The court also held that "the design and amalgamation of those features in a uniform fashion with other features . . . has produced the non-functional Blue Mountain 'look.'" *Id.* Some of the design features the court considered were the deckle edge on the right-side of the first page, a rough edge stripe of color, use of florescent ink, and the appearance of hand-lettered calligraphy. *Id.* at 1539.

Similarly, the selection and combination of functional features of a vehicle may constitute protected trade dress even though the features serve useful purposes. The question is not whether individual design elements of a trade dress are functional, but whether the trade dress in the aggregate is a functional one. In other words, one must look at the sum of the parts rather than the individual components and determine that an equally functional design cannot be created.

The Hummer H1 trade dress at issue is registered;[87] therefore nonfunctionality is presumed and Urban Gorilla bears the burden of disproving this element. Urban Gorilla makes a strong argument the features allegedly unique to the Hummer and its registered trade dress are in fact functional features shared by military-style vehicles in general. Specific design elements identified by GM as comprising its trade dress include the rectangular doors, high belt line,

---

[87] (Plaintiff's Exhibit P1-10.)

upstanding windshield with the split in the center, latch hooks on the front hood, running lights on the side of the vehicle, and the power dome configuration on the top of the hood.[88] Several examples were provided illustrating that these particular features are common in many military vehicles.[89] The features also serve a specific purpose, i.e. they are functional. For example, the split windshield provides structural support to the roof and the flat, upright windows.[90] Also, the "boxiness" of military style vehicles is functional because using flat panels allows for less expensive, smaller quantity production.[91]

Although Urban Gorilla has shown the functional aspects of several features of the Hummer trade dress, it has not shown that an equally functional design that is close in cost and quality is impossible. An equally functional design is one that would allow for the type of off-road activity common to both the Hummer and Urban Gorilla. The images presented by Urban Gorilla actually support a finding of non-functionality because many of the vehicles share functional features of the Hummer trade dress such as a high belt line, split windows, and flat body panels without evoking the Hummer "look."[92] GM also provides several examples of full-size SUVs that share some of the design features of the Hummer, but do not in totality resemble the Hummer trade dress.[93] Therefore, I find that Urban Gorilla has not met its burden of proving functionality.

---

[88] (Tr. Sept. 22 a.m., at 59:21-60:4.)

[89] (Defendant's Exhibit D76 ("D76").)

[90] (Tr. Sept. 24 p.m., at 512:20-513:17.)

[91] (D76.)

[92] (*See Id.*)

[93] (Plaintiff's Exhibit P31.)

**(2) The Trade Dress Must be Distinctive Inherently or Through Secondary Meaning**

Having found that the Hummer trade dress is distinctive through secondary meaning in the dilution analysis, I need not revisit the issue here. *See supra* 11-16.

**(3) There Must be a Likelihood of Confusion**

To determine whether a likelihood of confusion exists, six nonexhaustive factors are considered:

> (1) the degree of similarity between the products; (2) the intent of the alleged infringer in designing its product; (3) evidence of actual confusion; (4) similarity in how the products are marketed; (5) the degree of care likely to be exercised by purchasers; and (6) the strength of the trade dress.

*General Motors Corp. v. Urban Gorilla, LLC.*, 500 F.3d 1222, 1227 (10th Cir. 2007). Factors relevant to trademark infringement claims "apply equally to trade dress infringement claims." *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 979 (10th Cir. 2002). Likeliness of post-sale confusion—in addition to point of sale and initial interest confusion—is relevant to trade dress infringement inquiry. *Urban Gorilla*, 500 F.3d at 1227.[94]

Additionally, the Tenth Circuit has stressed the interrelatedness of the factors in assessing whether there is a likelihood of confusion.

> For example, a small degree of similarity between two marks may lead to a finding that confusion is likely when the products are identical, inexpensive items. On the other hand, very similar marks may not generate confusion as to the source of the products where the products are very different or relatively expensive.

*Beer Nuts v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir. 1986).

**(i)** Degree of similarity between the products

---

[94] Professor Beebe asserts that post-sale confusion is actionable when it comes to exclusive goods because "the brand's reputation for exclusiveness is damaged." Barton Beebe, *Intellectual Property Law and the Sumptuary Code*, 123 Harv L. Rev. 810, 852 (2010).

My finding in the dilution analysis that the soft top, hard top, and wagon models of Urban Gorilla are strongly similar to the Hummer trade dress holds true in this context. *See supra* 18-24. Accordingly, these particular models have a high degree of similarity with the Hummer trade dress, while the combat and slant back models do not.

**(ii)** Intent of the alleged infringer in designing its product

"Evidence that the alleged infringer chose a mark with the intent to copy, rather than randomly or by accident, typically supports an inference of likelihood of confusion." *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research, (FAIR)*, 527 F.3d 1045, 1055 (10th Cir. 2008). "The proper focus under this factor is whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 973 (10th Cir. 2002) (quoting *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1091 (10th Cir. 1999).)

Several facts support a finding that the owner of Active Power, Urban Gorilla's predecessor-in-interest, intended to replicate the Hummer trade dress in his initial design. In a series of questions related to the initial design of the body kits Christpher Ardern, owner of Active Power, made the following statements: (1) he was the designer of the original Urban Gorilla body kit in 1996;[95] (2) he "had the idea of a replica" and took action on his idea after seeing an ad for Sam's Surplus in a military vehicle magazine;[96] (3) he used sketches as a basis for the design but each body kit was primarily based off of the measurements of the previous

---

[95] (Tr. Sept. 22 p.m. (dkt. no. 162), at 143:20-24.)

[96] (*Id.* at 146:4-13.)

one;[97] and (4) surplus Humvee parts were used in the original design.[98]

There are also several facts to support a finding that Active Power and later Urban Gorilla attempted to distinguish the body kits from the Hummer trade dress. First, Active Power ceased using surplus hoods at the request of AM General and later also stopped using surplus windshields, tops, and doors.[99] Second, Urban Gorilla has made "dozens" of changes and modifications to the design of the body kit since taking ownership of the product line.[100] Third, design modifications were made so that Hummer surplus parts no longer fit on the body kits.[101]

It is also significant that Urban Gorilla purchased the assets of Urban Manufacturing from Mr. Ardern as opposed to purchasing the company. Where a company as an entire entity is purchased it is more plausible that any intent of the original owner would be transferred to the new owner because it is merely the ownership that has changed. But where a new entity is formed and purchases assets from a company a theory of transferred intent is less persuasive. Even GM acknowledges that "Urban Gorilla was an arms-length, third-party purchaser that brought in an entirely new set of management, employees, subcontractors, etc."[102] Therefore, in spite of Mr. Ardern's original intent in designing the body kits to replicate the Hummer H1, I find that Urban Gorilla did not share Mr. Ardern's intent and has actually taken several steps to distinguish its products.

---

[97] (*Id.* at 146:16-147:1.)

[98] (*Id.* at 150:14-19.)

[99] (*Id.* at 150:23-151:4.)

[100] (Tr. Sept. 23 p.m. (dkt. no. 163), at 314:13-22.)

[101] (Tr. Sept. 24 a.m. (dkt. no. 167), at 453:7-22.)

[102] (GM's Pretrial Brief (dkt. no. 149), at 42.)

**(iii)** Evidence of actual confusion

Evidence of actual confusion in the marketplace strongly supports a determination that likeliness of confusion exists. *Brunswick v. Spinit Reel*, 832 F.2d 513, 521 (10th Cir. 1987); *Vail Assocs. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853, 864 (10th Cir. 2008). However, if the evidence is de minimis, it does not support such a holding. *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 974 (10th Cir. 2002).

"[P]ublic recognition surveys can be used to show actual confusion. However, the evidentiary value of such surveys depends on the relevance of the questions asked and the technical adequacy of the survey procedures." *Jordache Enters. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1487 (10th Cir. 1987). Confusion rates of 25 percent or greater constitute strong evidence of actual confusion. *Sally Beauty*, 304 F.3d at 974. Additionally, the survey respondents must be an adequate sample of the "relevant universe, " *i.e.*, persons who have "opinions which are relevant to the litigation." *Harold Stores, Inc. v. Dillard Dep't Stores*, 82 F.3d 1533, 1544 (10th Cir. 1996). "The appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringers goods or services." *Exxon Corp. v. Texas Motor Exchange, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980).

In the present case, a survey conducted by Dr. Glenn Christensen was offered by GM to establish that there is actual confusion in the marketplace between the Hummer and an assembled Urban Gorilla.[103] The survey is strongly contested by Urban Gorilla primarily on grounds that the "universe" of respondents surveyed was too broad.

---

[103] (Tr. Sept. 23 a.m. (dkt. no. 156), 177:1-9.)

The survey was a double-blind, test-control survey administered online.[104] Respondents viewed three images from different viewpoints of either an assembled Urban Gorilla wagon model body kit or a military-style control vehicle.[105] Each respondent then answered a series of questions related to the images.[106] The terms "Hummer," "GM," or "Urban Gorilla" were not used in the questions about the images and there were no other brand identifiers.[107]

The survey pool consisted of 1127 respondents, 1100 of which were ultimately included in the statistical calculations.[108] Dr. Christensen identified individuals in the "relevant" group as a "consumer who has purchased in the last three years or plans to purchase within the next three years a new or used four-wheel drive SUV with off-road capability and who is a decisionmaker in their household for a car, truck, or SUV" because both GM and Urban Gorilla market their products to this group.[109] A random selection of individuals who met market data demographics affiliated with this group were invited to participate in the survey.[110]

Half of the 1100 respondents completed the test condition survey and the other 550 completed the control condition.[111] In the summary of his findings Dr. Christensen shared that the net confusion rate among those surveyed was 50.4%.[112] This percentage represents the

---

[104] (Plaintiff's Exhibit P12, at 9-10 and 14 ("P12").)

[105] (*Id.* at 22-23.)

[106] (*Id.*)

[107] (*Id.* at 63.)

[108] (*Id.* at 31.)

[109] (Tr. Sept. 23 a.m. (dkt. no. 156), at 234:17-21.)

[110] (Tr. Sept. 23 p.m., at 282:17-19; Tr. Sept. 23 a.m., at 191:13-15.)

[111] (P12 at 20.)

[112] (*Id.* at 6.)

difference between the number of respondents in the control condition who associated the images with Hummer or GM (21.1%) and those in the test condition who associated the image with Hummer or GM (71.5%).

Urban Gorilla acknowledges that consumers in the target market of either the Hummer H1 or the Urban Gorilla body kit are relevant to the litigation; *i.e.*, either potential buyers of a $150,000 luxury vehicle or a military-style off road vehicle.[113] Urban Gorilla goes on to argue, however, that only actual or potential Hummer purchasers should have been surveyed and attacks the survey pool on the grounds that its demographic data does not mirror the demographic data for the Hummer target market.[114] The demographics of the Hummer target market are individuals with an income of about $200,000 a year who are 40+ years old and have grown children.[115] The Urban Gorilla target market demographics are middle to lower income, former military, "do-it-yourselfers."[116]

If it was only the confusion of Hummer purchasers that was of concern, then Urban Gorilla would be correct that the pool was over broad. However, the Tenth Circuit recently stated while explaining why post-sale confusion is relevant in trade dress infringement actions that the "Lanham Act was intended to protect the market as a whole from confusion as to the source of a product." *General Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d. 1222, 1227 (10th Cir. 2007). Within the "market as a whole" those with opinions relevant to the litigation are

---

[113] (Defendant's Memorandum in Support of Motion to Strike the Expert Report and Survey of Dr. Glenn Christensen (dkt. no. 121), at 4.)

[114] (*Id.* at 7.)

[115] (Tr. Sept. 24 a.m. (dkt. no. 167), at 409:11-14.)

[116] (Tr. Sept. 24 a.m., at 442:24 - 443:5.)

those who are potential or actual purchasers of both the Hummer and the Urban Gorilla body kit. The demographics of the survey pool encompass the income level, gender, age, and educational attainment of both the Hummer and Urban Gorilla target markets.[117]  Therefore, the pool surveyed is a fair one for this matter.

Furthermore, the responses to the survey are compelling.  Over 70% of the individuals who looked at the images of the assembled Urban Gorilla thought it was a Hummer or affiliated in some way.  The respondents in this case repeatedly said the Urban Gorilla was a "Hummer" and when asked why, the oft recurring response was "because it looks like one."  These responses strongly suggest, if not prove, actual confusion.  Due to this compelling survey evidence, I find that there is actual post-sale confusion between the Urban Gorilla and Hummer. Therefore, this factor weighs in favor of GM.

**(iv)** Similarity in how the products are marketed

In analyzing similarity in how the products are marketed the court may consider whether the parties are competitors and the commercial channels used to reach their respective consumers.  *Sally Beauty*, 304 F.3d at 974-975.

The parties here are not direct competitors.  Urban Gorilla sells unassembled body kits that "mechanically inclined" "do-it-yourselfers" assemble and attach to a donor chassis.[118] Hummer, on the other hand, sells turn key vehicles to affluent "rugged individualists" and "successful achievers."[119]  There are isolated examples of direct competition including evidence

---

[117] For a list of demographic data for the survey pool *see* Plaintiff's Exhibit P33.

[118] (Tr. Sept. 24 a.m., at 442:24-443:5.)

[119] (*Id.*, at 409:5-8.)

that Urban Gorilla attempted to sell one assembled body kit online and a quote from an Urban

Gorilla customer who sold his Hummer H1 and bought two body kits instead.[120]  In spite of this

evidence, however, when directly asked who its competitors are the former general manager of

Hummer and current executive director of strategic marketing for GM said that between 1999-

2004 Hummer's closest competitor was the Land Rover.  This statement from GM combined

with the different target markets for the two products indicate that the parties are not competitors

in any meaningful sense of the word.

Regarding the means of marketing used by the parties, GM markets its products using

print brochures, in newspapers and magazines, on television, through an internet web site,

through dealerships, and at special events.[121]  Urban Gorilla also markets its products using print

brochures and through an internet web site.[122]  Urban Gorilla has been featured on the television

show *Xtreme 4 x 4* but has never purchased television advertising time.[123]  Urban Gorilla was

also listed in a magazine called *Kit Car Buyer's Guide* but, again, did not pay to be included and

has not advertised in any of the magazines and newspapers listed by GM.[124]

Overall there are relatively few similarities in how and to whom the Hummer is marketed

as compared to the Urban Gorilla body kit.  The fact that both have web sites and both have been

featured on television and in print publications is inconclusive.  The companies are not direct

competitors and seek to reach customers with different demographics (*e.g.*, high versus middle to

---

[120] (Tr. Sept. 24 p.m. (dkt. no. 164), at 498:17-24; Plaintiff's Exhibit P40-1.3; Plaintiff's Exhibit P21, at 2.)

[121] (Tr. Sept. 22 a.m. (dkt. no. 169), at 37:20-23 and 41:20-25; Tr. Sept. 24 a.m. (dkt. no. 167), at 409:1-2.)

[122] (Tr. Sept. 24 a.m., at 475:3-10; Tr. Sept. 22 a.m. (dkt. no. 162), at 149:13-15; Tr. Sept. 23 p.m. (dkt. no. 163), at 24-25.)

[123] (Tr. Sept. 24 a.m., at 432:23-433:6.)

[124] (Tr. Sept. 23 p.m. (dkt. no. 163), at 318:12-23; Tr. Sept. 24 a.m., at 432:5-16.)

low income) via different channels.  Accordingly, this factor weighs in favor of Urban Gorilla.

**(v)** Degree of care likely to be exercised by purchasers

Likelihood of confusion is reduced when a buyer exercises a high degree of care in selecting a product.  *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 557 (10th Cir. 1998).  "Buyers typically exercise little care in the selection of inexpensive items that may be purchased on impulse" and a higher degree of care with expensive items.  *Beer Nuts II*, 805 F.2d at 926.  "The relevant inquiry focuses on the consumer's degree of care exercised at the time of purchase."  *Sally Beauty*, 304 F.3d at 975.

In a case such as this where the main point of confusion is post sale, the degree of care exercised by purchasers is of diminished importance because it is not the purchasers' confusion that is of concern. That being said, a Hummer H1 purchaser would exercise a high degree of care in selection of the vehicle because of its price tag of approximate $140,000 which in turn reduces the likelihood of confusion.

**(vi)** Strength of the trade dress

"The stronger the evidence of the secondary meaning, the stronger the mark, and the more likely is confusion."  *Vail Assocs.*, 516 F.3d at 866; *Sally Beauty Co.*, 304 F.3d at 975.  "Strength consists of both conceptual strength, which refers to the placement of the mark along the distinctiveness spectrum, and commercial strength, which refers to the marketplace recognition value of the mark. *Utah Lighthouse Ministry*, 527 F.3d at 1056.

The conceptual strength of the Hummer trade dress is weak because many of its features are common to military vehicles in general. However, GM's longtime use of the H1 trade dress, advertising efforts, and actual confusion in the marketplace provide strong evidence of secondary

meaning.  *See supra* 11-16.  Thus, the mark is commercially strong.

On balance, a likelihood of confusion exists between the Hummer trade dress and some models of the Urban Gorilla.  The appearance of the soft top, hard top, and wagon models of Urban Gorilla as marketed is similar to that of the Hummer trade dress, the mark is fairly strong, and Dr. Christensen's survey results strongly suggest that there is actual post-sale confusion in the marketplace.  Although several factors weigh in favor of Urban Gorilla including the lack of intent to copy, the high degree of care likely to be exercised by purchasers, and the different marketing techniques used by the two companies, evidence of actual confusion "strongly supports a determination that likeliness of confusion exists." *Brunswick v. Spinit Reel*, 832 F.2d 513, 521 (10th Cir. 1987).  Furthermore, because GM has also established the remaining two elements of its infringement claim—nonfunctionality and secondary meaning—it has met its burden and should prevail on its trade dress infringement claim.

**D.  Common Law Trademark Claims**

Having found that GM proved its federal infringement and dilution claims, I do not reach GM's common law trademark claims.

**E.  Defenses**

***(1) Laches Defense***

"Laches consists of two elements: (1) inexcusable delay in instituting suit; and (2) resulting prejudice to defendant from such delay." *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 523 (10th Cir. 1987); *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 569 (6th Cir. 2000). Laches may preclude a plaintiff from recovering damages, but does not bar injunctive relief in

cases of conscious infringement or fraud.[125]  *See United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 102 (1918); *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 568 (6th Cir. 2000); *Menendez v. Holt,* 128 U.S. 514 (1888); *McLean v. Fleming*, 96 U.S. 245 (1878).

**(i)** Plaintiff Must Inexcusably Delay in Instituting Suit

"Generally speaking, the relevant delay is the period from when the plaintiff knew (or should have known) of the allegedly infringing conduct, until the initiation of the lawsuit . . . ." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 949 (10th Cir. 2002).  A plaintiff must "exercise reasonable diligence in protecting his rights."  *Id.* at 950.  Delay of up to three years has been found excusable.[126]  However, delay of over six years has generally been found inexcusable.[127]

The primary issue here is when GM knew or should have known of Urban Gorilla's conduct.  GM indicates that it did not know of the Urban Gorilla product line until November 23, 2005 when GM's then IP counsel was forwarded an email bringing Urban Gorilla to his attention.[128]  Urban Gorilla contends, however, that GM should have known of the product line actually or constructively as early as December 1999 when GM acquired the Hummer line from

---

[125] The logical alternative is that when a defendant does not consciously or fraudulently infringe, then laches may bar injunctive relief.  However, I do not directly reach this question.

[126] *See King v. Innovation Books*, 976 F.2d 824 (2d Cir. 1992) (delay of eight months was excusable); *Brunswick*, 832 F.2d at 524 (delay of one year was excusable); *Jacobsen*, 287 F.3d at 950 (delay of three years was excusable where plaintiff was "justifiably ignorant of the facts creating his . . . cause of action."); *Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 933 (7th Cir. 1984) (two years has rarely been held sufficient delay to establish laches).

[127] *See Santana Products, Inc. v. Bobrick Washroom Equipment Inc.*, 401 F.3d 123 (3d Cir. 2005) (false advertising claim was barred by laches where suit was filed after six-year statute of limitations); *Wisconsin Cheese Group, Inc. v. V & V Supremo Foods, Inc.*, 537 F.Supp.2d 994 (W.D. Wis. 2008) (Fourteen-year delay in taking legal action was not excused by doctrine of progressive encroachment).

[128] (Tr. Sept. 22 a.m. (dkt. no. 169), at 51:21-52:21.)

AM General.[129]  Alternatively, Urban Gorilla argues that GM had actual notice of the body kits in March 2001 via the Tolbert affidavit in the Tatonka litigation.[130]  The relevant facts are as follows:

GM sued Tatonka products in January 2001.[131]  In March of 2001, Mr. Tolbert, owner of Tatonka, filed an affidavit in the suit which included a copy of the September 1998 *Kit Car Buyer's Guide* as an attachment.[132]  The ad included the Bummer, which was a body kit produced by Tatonka Products, along with several others including the Urban Gorilla.[133]  Urban Gorilla claims this legal document put GM on notice for laches purposes.

Looking back even further, the parties predecessors-in-interest were in contact with each other as early as 1998.  On October 6, 1998 a cease and desist letter was sent from AM General to Mr. Ardern, then owner of the Urban Gorilla product line.[134]  James O'Leary, counsel for Active Power, responded to the letter via fax and phone and indicated Active Power's willingness to change its nose and grill design as requested by AM General.[135]  A few months later AM General changed counsel and in February of 1999 all open files were transferred from Brooks & Kushman to Barnes & Thornburg.[136]  Paul Hunt, an attorney at Barnes & Thornburg, became involved in the matter and sent a letter to Active Power following up on the previous

---

[129] (*See generally* Memorandum in Opposition to Motion for Preliminary Injunction (dkt. no. 11), at 8.)

[130] (Tr. Sept. 25 a.m. (dkt. no. 165), at 556:9-25.)

[131] (Complaint in *General Motors v. Gamut Design*, 2:01-cv-00046-TC, filed Jan. 18, 2001.)

[132] (Defendant's Exhibit D77 ("D77"), at "Exhibit 6".)

[133] (D77.)

[134] (Defendant's Exhibit D27, at "Exhibit 4.")

[135] (*Id.*)

[136] (Tr. Sept. 23 p.m. (dkt. no. 163), at 355:18-21.)

correspondence from Brooks & Kushman.[137]  In his introductory letter Mr. Hunt requested copies

of the design changes to the Urban Gorilla.[138]  There is disagreement as to whether the changes

were ever sent or ever received.  Later that year in December 1999 GM acquired AM General

and the AM General files in the possession of Barnes & Thornburg were transferred to GM.[139]

The agreement between AM General and GM included these clauses related to trademark

matters:

> AMG [AM General] agrees to notify GM in writing of any suspected infringing
> activity by other entities which may come to AMG's attention . . . AMG agrees to
> provide to GM . . . copies of all files in its possession or control related to any past
> or current trademark matters pertaining to the Hummer Trademarks . . . AMG hereby
> assigns to GM, and GM accepts all rights AMG may have to pursue and recover for
> any and all past, present and future trademark infringements regarding the Hummer
> Trademarks . . .[140]

Paul Hunt testified that he authorized the files to be sent to GM from his firm.[141]  On the

receiving end, Charles Ellerbrock testified that when he came to GM in 2000 the files for open

trademark infringement matters had been delivered to GM.[142]

Although these facts could lead to the inference that GM actually knew of the product

line through the files it acquired from AM General, they are simply not conclusive enough.  The

question of when GM should have known is a slightly tougher one. If GM did have the files from

AM General about the Urban Gorilla body kits, then there is a strong argument that from the

---

[137] (Defendant's Exhibit D27, at "Exhibit 4.")

[138] (*Id.*)

[139] (Plaintiff's Exhibit P5.)

[140] (*Id.* at ¶¶ 5.4 and 5.5.)

[141] (Tr. Sept. 23 p.m. (dkt. no. 163), at 378:10-12.)

[142] (Tr. Sept. 22 a.m. (dkt. no 169), at 66:15-19.)

point when it acquired the files it should have known of the body kits. The evidence, however, is not strong enough to draw the inference that GM actually had the files.

Additionally, I find that a reference to a party in an exhibit attached to an affidavit for a different lawsuit does not provide notice of the party's existence. Finally, GM has shown it has a history of diligently prosecuting its marks. Given that history it seems unlikely that GM would simply turn a blind eye to Urban Gorilla's product line. Therefore, I find that GM knew of the Urban Gorilla body kits on November 23, 2005 and the three month delay in filing suit was not unreasonable or inexcusable.

**(ii)** Resulting Prejudice to Defendant from Delay Must Exist

Having found that GM's delay was not inexcusable, I do not reach the question of whether Urban Gorilla was prejudiced as a result.

*(2) Acquiescence Defense*

The affirmative defense of acquiescence requires a "finding of conduct on the plaintiff's part that amounted to an assurance to the defendant *express* or *implied*, that plaintiff would not assert his trademark rights against the defendant." *Creative Gifts v. UFO*, 235 F.3d 540, 547-48 (10th Cir. 2000) (emphasis added). Where a plaintiff seeks injunctive relief, the defense "requires more than a showing of mere silence on the part of the plaintiff; defendant must show that it had been misled by plaintiff through actual misrepresentations, affirmative acts of misconduct, intentional misleading silence, or conduct amounting to virtual abandonment of the trademark." *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 574 (6th Cir. 2000).

Additionally, acquiescence is a personal defense which results only in a loss of rights by the plaintiff against the person or company to which it granted assurances. *Sweetheart Plastics v.*

44

*Detroit Forming*, 743 F.2d 1039, 1046 (4th Cir. 1985); *Exxon Corp. v. Oxxford Clothes*, 109

F.3d 1070, 1076 n. 7 (5th Cir. 1997); *National Football League v. Rondor, Inc.*, 840 F. Supp.

1160, 1167 (N.D. Ohio 1993); *Adidas Am., Inc. v. Kmart Corp.*, 2006 U.S. Dist. LEXIS 49766

(D. Or. 2006); J. T. McCarthy, *Trademarks and Unfair Competition* § 31:43 (4th ed. 2010).

There are two key questions here. First, did AM General acquiesced to Active Power's

conduct related to the Hummer marks? Second, assuming there was acquiescence by AM

General can the acquiescence can be transferred to Urban Gorilla?

Prior to the filing of this complaint on February 13, 2006 there had been no direct contact

between GM and Urban Gorilla. There had been contact, however, between the two parties

predecessors-in-interest, Active Power and AM General. As indicated in the laches analysis, AM

General sent a cease and desist letter to Active Power in 1998 and Active agreed to make

changes to its body kits addressing the concerns stated.[143]  Several subsequent letters were

exchanged. The final letter in the record was from AM General's new counsel to Active Power

requesting to view the design changes to the body kit.[144]  Active Power responded by leaving a

voicemail for AM General on March 24, 1999.[145]  No further contact between the parties was

indicated.

These facts and a close review of the letters themselves do not amount to an affirmative

representation by AM General that Active Power's use of the marks was permissible. What

Urban Gorilla has shown is that there were negotiations between AM General and Active Power

---

[143] (Defendant's Exhibit D27, at "Exhibit 4.")

[144] (*Id.*)

[145] (*Id.*; Tr. Sept. 23 p.m., at 336:1-5.)

related to the design of the body kits, but no resolution.  Additionally, Urban Gorilla is unable to show any contact at all between the parties from 1999 through 2006.  A complete lack of contact can hardly be called an assurance on the part of the plaintiff that it will not sue the defendant. Nor can the silence be characterized as intentionally misleading.  If anything, GM's silence seems completely unintentional and a result of files either misplaced or never received following its acquisition of the Hummer trademarks from AM General.  Therefore, Urban Gorilla's acquiescence defense fails.  Because I find that AM General did not acquiesce, I do not reach the question of whether the defense is only a personal one.

## F.  Costs

### *(1) Trademark Dilution*

The remedies set forth in § 1117(a) (relating to profits; damages and costs; and attorneys fees) are available in a trademark dilution case only if the plaintiff meets the requirements of the previous § 1125(c) which requires a showing of actual dilution.  *See supra* 7-8. The U.S. Supreme Court also held prior to the 2006 Amendments of § 1125(c) that "proof of actual injury to the economic value of a famous mark" is required to succeed on a claim of dilution.  *Moseley v. V. Secret Catalogue, Inc.*, 537 U.S. 418, 422 (2003); *General Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1229 (10th Cir. 2007).  Although proof of actual loss of sales or profits is not necessary, the plaintiff must show that the defendant's use reduces "the capacity of the famous mark to identify the goods of its owner . . ."  *Moseley*, 537 U.S. at 433.

Moreover, injunctive relief is the exclusive remedy available unless "the person against whom the injunction is sought *willfully* intended to trade on the owners reputation or to cause dilution of the famous mark."  FTDA § 3(a) (emphasis added).  To determine willfulness, "the

proper focus is whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff." *Western Diversified Servs. v. Hyundai Motor Am., Inc*., 427 F.3d 1269, 1273-1274 (10th Cir. 2005). The defendant's intent must be "something more than 'indifference' or a mere 'connection.' It is a conscious desire." *Id.* at 1274. The court has discretion whether to award additional remedies under § 1117 "subject to principles of equity." 15 U.S.C. § 1117(a).

It is a close call regarding whether Urban Gorilla willfully intended to trade on the Hummer reputation. Urban Gorilla's strategic use of the Hummer name on its web site indicates an intent to associate with the trademark but it is a logical leap to say that intent to associate amounts to willful use of the plaintiff's mark or goodwill. *See supra* 25-26.

It is also a close call regarding whether GM has shown actual injury to the economic value of its marks. To the extent that Urban Gorilla has used identical marks, it has reduced the capacity of the Hummer marks to identify exclusively the Hummer line. However, we find the impact negligible. First, the only instance where Urban Gorilla used identical marks was indirect through its reference to the Hummer name in its web page to drive web traffic and increase search engine hits. Also, a very small quantity of body kits have been sold (barely over 100 over twelve years). Exercising my discretion, GM should not be awarded costs on the basis of its dilution claim and each party will bear its own costs.

### (2) Trademark Infringement

Generally, parties to adversary litigation are required to pay their own costs and attorney's fees. *Blum v. William Goldman Theatres, Inc.*, 164 F.2d 192, 198 (3d Cir. 1947) *(citing Alexander v. Herr's Ex'rs*, 11 Pa. 539 (1849)). Upon a violation of § 1125(a), "the plaintiff shall be entitled . . . subject to principles of equity, to recover (1) defendant's profits, (2) any damages

sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Typically, the court will deny plaintiff's recovery of litigation expenses in the absence of fraud.[146] Fraud is "a knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment." *Black's Law Dictionary* 731 (9th ed. 2009).

GM has established that some models of the Urban Gorilla infringe on its Hummer trade dress. Therefore, the remedies under § 1117 are available subject to principles of equity. As stated previously, there is insufficient evidence to support a finding that Urban Gorilla acted in bad faith. *See supra* 25-26. Furthermore, even if Active Power acted in bad faith the intent can not be transferred to Urban Gorilla.[147] Urban Gorilla has also made many changes to the body kit design since taking ownership, has taken steps to remove any references to Hummer from its web site and marking materials, and has shown a willingness to work with GM to address its infringement concerns.[148]

Moreover, Urban Gorilla certainly did not act fraudulently in this case. Fraud requires a knowing misrepresentation or concealment and detrimental reliance. Here there is neither. Urban Gorilla does not advertise its body kits as Hummers, it advertises them as essentially an alternative to the Hummer. Having no misrepresentation, there can be no detrimental reliance. Absent bad faith or fraud on the part of Urban Gorilla I find it inequitable to award costs to the

---

[146] *See Williamson-Dickie Mfg. Co. v. Davis Mfg. Co.*, 251 F.2d 924, 927 (3d Cir. 1958); *Salton, Inc. v. Cornwall Corp.*, 477 F. Supp. 975, 992 (D.N.J. 1979); *Frostie Co. v. Dr. Pepper Co.*, 361 F.2d 124, 127 n.9 (5th Cir. 1966) (stating that "costs are allowable only where the wrongdoer's action is fraudulent, willful, or in bad faith").

[147] GM acknowledges that "Urban Gorilla was an arms-length, third-party purchaser that brought in an entirely new set of management, employees, subcontractors, etc." (GM's Pretrial Brief (dkt. no. 149), at 42.)

[148] (Tr. Sept. 23 p.m. (dkt. no. 163), at 315:20-22; Urban Gorilla's Trial Brief, filed Sept. 19, 2008 (dkt. no. 150), at 6.)

plaintiff. Accordingly, each party will bear its own costs.

## G. Attorney's Fees

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). An exceptional case "is one in which the trademark infringement can be characterized as 'malicious,' 'fraudulent,' 'deliberate,' or 'willful.'" *Brunswick Corp. v. Spirit Reel Co.*, 832 F.2d 513, 528 (10th Cir. 1987). Intentional copying alone without more does not amount to willful infringement. *Brunswick*, 832 F.2d at 529. For the same reasons stated above related to intent, I find that this case is not exceptional and therefore GM is not granted its attorney's fees.

## III. Conclusion

While I am tempted by the laches defense, as an aid to the parties to clarify future relationships and future conduct I make these conclusions. Plaintiff is entitled to injunctive relief to preclude likely dilution and future infringement of its marks.

Let judgment be entered accordingly.

DATED this _27_ day of December, 2010.

BY THE COURT:

_____
Bruce S. Jenkins
United States Senior District Judge

49